647 A.2d 116

Jason Lamont JOYNER–PITTS

v.

STATE of Maryland.

No. 1789, Sept. Term, 1993.

Court of Special Appeals of Maryland.

Sept. 6, 1994.

Bradford C. Peabody, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Mary Inn Ince, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Alexander Williams, Jr., State's Atty. for Prince George's County of Upper Marlboro, on the brief), for appellee.

Submitted before WILNER, C.J., and GARRITY and HARRELL, JJ.

HARRELL, Judge.

Jason Lamont Joyner–Pitts was charged with the murder of his girlfriend's seventeen month old child, Shalinia. Following a third trial, appellant was convicted by a jury in the Circuit Court for Prince George's County of second degree murder. He was sentenced by the court to twenty years imprisonment.

The first mistrial occurred as a result of an utterance by the prosecutor made in the course of the trial. The second trial took place in May 1993. Although appellant was being tried under a one count indictment charging first degree murder, the court instructed the jury that, under the single count, it could consider whether the State had proven that Joyner–Pitts was guilty of: (1) murder in the first degree; (2) murder in the second degree—specific intent; (3) murder in the second degree—depraved heart; or, (4) manslaughter as a

result of a grossly negligent act. To aid the jury in its deliberations, the court apparently gave the jury a paper with these four variations of homicide listed.[1] The defense characterized the paper as a "special verdict sheet." The court disagreed, characterizing it as "a scorecard I gave them to keep track of the four ways a person could be guilty under this [one count] indictment of this charge."

The case went to the jury on 20 May 1993. Around the noon hour on 21 May, the jury sent the court a note stating "We have a 10–2 jury. What do we do and how?" When the jury foreperson was unable to respond to the court's question whether further deliberation would assist in movement one way or the other, the jury was excused for lunch so the judge could consider what to do next, after consultation with counsel. When court was reconvened after the luncheon recess, the judge sent the jury back to consider whether further deliberation would assist in movement to a unanimous verdict or whether the positions were irrevocably locked in.

Thirty minutes passed before another note was sent out by the jury. It said "Further deliberations in our opinion will not result in a unanimous decision." The judge brought the jury back, gave them an *Allen* charge, and sent them back a few minutes before 2:00 p.m. to resume deliberations. A very short time later, the jury sent a third note indicating "After further deliberation[,] we are still at deadlock. Please advise."

Out of the jury's presence, counsel and the court discussed the situation. Defense counsel wanted the judge to bring the jury in and "take a verdict on any of the offenses set out in the special verdict sheet and declare a mistrial as to any offenses that they can't reach a verdict on." The judge refused to do that, explaining that he interpreted the jury's "10–2" vote as an indication that they were unable to reach a unanimous verdict on the single count indictment. Defense counsel argued it would be "absolutely unjust" to subject Joyner–Pitts to

---

1. This document was not a part of the record transmitted with this appeal.

jeopardy at yet another trial on any of the submitted versions of homicide if the jury unanimously could find him not guilty as to that version. The State, on the other hand, urged the court to make the jury continue to deliberate. The judge was unwilling to do that, observing that, in view of the jury's position, to do so would be coercive.

The jury was returned to the courtroom. After the foreperson advised the court that further deliberation would not be productive, defense counsel asked the judge to "inquire whether they've reached a verdict as to any of the offenses that were set out on the verdict sheet." Instead, the judge inquired of the jury whether they would be "able to give us a unanimous verdict as to this one count indictment?" After the foreperson responded in the negative, a mistrial was declared due to the jury deadlock.

Prior to commencement of his third trial, appellant filed a motion to dismiss on the ground that the court's refusal in the second trial to ask the jury if it could find appellant not guilty of either first or second degree murder violated his right not to be retried for first degree murder. In his motion, appellant asserted that there was a "substantial basis to believe that defendant may have been acquitted of first degree murder or first degree and second degree murder in this case." The relief sought in the motion was that the court "dismiss any charges against the defendant to which the jury has previously reached a verdict."

At the hearing on appellant's motion to dismiss conducted on 21 September 1993, the judge, after ruling that it was inadmissible hearsay for the foreperson of the jury in the second trial, called as appellant's witness, to answer defense counsel's questions about what happened in the prior jury deliberations, himself asked the witness what the result of the jury's deliberations had been on each of the varieties of homicide that had been submitted to it. The witness responded: (a) 12–0 not guilty as to first degree murder; (b) 12–0 not guilty as to second degree murder, specific intent; (c) 10 voting guilty as to second degree murder, depraved heart;

and, (d) 2 voting guilty of manslaughter. Quixotically, the trial judge restated his opinion that the foregoing testimony was inadmissible as hearsay, but because he wanted "to get to the nub" of appellant's contention, he admitted the testimony "for the purposes of this hearing." The "nub," as the judge saw it, was whether the court was required to take partial verdicts.

Appellant argued that the anomaly of Maryland law that permits under a single count indictment for first degree murder the consideration of lesser included varieties of homicide requires, in recognition of a defendant's constitutional right not to be twice put in jeopardy for the same offense, that a judge receive and accept partial verdicts on any of the included varieties of homicide, Maryland Rule 4–327(d) notwithstanding. Stated another way, for constitutional analysis, appellant contended that each of the homicide varieties included under the single count should be viewed as separately charged offenses.

The trial judge denied the motion to dismiss. In explaining his ruling, he seemed at first to recant his earlier, somewhat ambiguous evidentiary ruling as to the admissibility of the jury foreperson's testimony. He stated "I don't believe the evidence is before the Court because as I ruled, the evidence before the Court was blatant hearsay evidence." He continued, however, saying:

> But going beyond that I don't think it makes any difference because I do not believe the state of the law is at this moment that when you submit a one count indictment to the jury and the jury comes back and says we're ten to two that you have the—that the Judge then has the duty to say in what regard are you ten to two?

At some point between the court's denial of the motion to dismiss on 21 September and the commencement of the third trial the next morning, the State "dumped the first degree murder charge." This we are able to infer from a comment made by defense counsel early in the proceedings on 22 September. Thus, the third trial proceeded only on the

remaining varieties of homicide—second degree (specific intent), second degree murder (depraved heart), and manslaughter. The jury returned its verdicts of not guilty to second degree murder (specific intent) and guilty of second degree murder (depraved heart) on 28 September 1993. This appeal followed.

## ISSUES

Appellant has posed three questions for our consideration:

I. Did the trial court err in denying the motion to dismiss the charge of second degree specific intent murder and in sending that count to the jury?

II. Did the trial court give an improper instruction on the meaning of proof "beyond a reasonable doubt"?

III. Did the trial court err in admitting Appellant's statement to the police?

Because of our affirmative reply to appellant's second question, we need not address his third question. We do deem it necessary, however, to reach his initial query in this opinion.

## FACTS

On Friday, 14 August 1992, at about 3:00 a.m., appellant, who was seventeen years old at the time, arrived at the basement apartment of his seventeen year old girlfriend, Wilhandest Shannon, in Landover, Prince George's County. Ms. Shannon lived there with her two children, Shalinia, age 17 months, and Daniel, age 2 years.

Sunday evening, 16 August, Ms. Shannon and appellant had "an argument. . . . about Shalinia," and "about going to bed." Afterwards, appellant slept on the floor.

On Monday morning, 17 August, Ms. Shannon left for work, after leaving Shalinia with her landlady, Gloria Herrera, who lived upstairs in the same house. Appellant walked with Ms. Shannon to the bus stop at about 8:30 a.m. Ms. Shannon told appellant to "go home," explaining to him: "That we was having a problem and things weren't going to change."

According to the landlady, when appellant returned to the house that morning, he took Shalinia and went downstairs.

Later that afternoon, appellant came upstairs to tell the other occupants of the house to "call on the phone." Herrera followed appellant downstairs, where "he was breathing on her [Shalinia's] mouth and rubbing her chest."

The responding firefighters testified that appellant was attempting to perform CPR on the child and saying "don't die, don't die." Asked what happened, appellant told one firefighter that he was "trying to sleep" and he "told the baby to leave me alone, but she wouldn't. She kept wanting to play." Then, he "went upstairs," and returned to find her in that condition.

The child died from "multiple blunt force injuries" and "associated blood loss."

In his written statement to a detective, appellant said he was trying to sleep, but the baby kept "kicking" him. He professed not to know how the baby was injured.

### DISCUSSION

### I.

Appellant's first question would be an interesting one if the record before us necessitated our addressing it on the merits. Were we to assume for the sake of this discussion that it was error, under a constitutional double jeopardy analysis, for the trial judge to have declined to inquire of the jury in the second trial whether they had voted unanimously to acquit appellant of first degree or second degree murder, and thus to have denied, also erroneously, his motion to dismiss, we would hold that appellant cannot demonstrate how he was harmed or prejudiced by the assumed errors under the circumstances of this case. We explain.

Appellant's motion to dismiss stated, in pertinent part:

It is highly probable that the jury had reached unanimous verdicts with respect to one or more of the charges.

\* \* \* \* \* \*

There is a substantial basis to believe that the defendant may have been acquitted of first degree murder or first degree and second degree murder in this case. In the event the defendant has been acquitted of first degree murder it would be a clear violation of his Constitutional right to avoid double jeopardy to retry the defendant for first degree murder in this case.

WHEREFORE, the Defendant requests that the Court dismiss any charges against the defendant to which the jury has previously reached a verdict and that the matter be set for hearing prior to the third scheduled trial of this case on September 22, 1993.

Appellant offered no factual allegations in his motion to support his assertions of the high "probability" or "substantial basis" that the jury had voted to acquit him of first degree murder or either sub-species of second degree murder.

Even if we were to consider also the testimony of the former jury foreperson adduced at the motion hearing on 21 September, the most that appellant was able to adduce in support of the allegations in his motion was that the second jury had unanimously voted to find him *not* guilty of first degree and second degree-specific intent murder. As was noted earlier, appellant was not subject to conviction for first degree murder in the third trial due to the State's withdrawal of that particular charge prior to commencement of the trial. Moreover, the jury in the third trial specifically found appellant not guilty of second degree—specific intent murder. Giving appellant the full benefit of the "evidence" viewed in a light most favorable to his contention, through a combination of the State's action in withdrawing the first degree murder charge and the third jury's acquittal as to second degree—specific intent murder, appellant received the full benefit of what he "proved" the second jury would have done had the trial judge requested and received "partial verdicts" at the

close of the second trial. Accordingly, we hold, beyond a reasonable doubt, that appellant was in no way harmed or prejudiced, in a legal sense, by the trial judge's denial of the motion to dismiss.

## II.

■ Our disposition of appellant's first argument notwithstanding, we are persuaded that he is entitled to a new trial, as to the charges of second degree—depraved heart murder and manslaughter of the grossly negligent variety, due to prejudicial error committed by the trial judge in his instructions to the jury regarding reasonable doubt. Our reasoning for this conclusion begins, of course, with the judge's rather lengthy, home-spun instruction:

> Let us return back to the State's burden, called the State's burden of proof. This burden of proof requires that the State of Maryland convince 12 of you, as I said, that a crime has been committed, and Mr. Jason Lamont Joyner–Pitts is the actor. When I say convince twelve of you they must convince you beyond a reasonable doubt.

> Of all the elements that together make up the crime of his involvement, this beyond a reasonable doubt is sort of a mouthful of lawyer talk. That phrase is the name that we in the law centuries ago attached to the state of mental conviction at which you must arrive before you can put your hand and say I will vote for guilty on that. Anything short of that you must vote—not voting for guilty, you are squarely in the corner of innocence.

> That state of mind has been variously described as that you be as convinced of what need be proven to prove this man's guilt as you would have to be convinced of something very weighty in your own lives, such as adopting a child, buying a home, getting married. I have actually heard it described when I practiced back in the 60s, judges just used to sit up here and say ladies and gentlemen of the jury you will be said to be convinced beyond a reasonable doubt when

you are convinced to a moral certainty. They usually shook their finger.

The problem with that I always found was that sort of replaced one totally incomprehensible legal concept with another totally incomprehensible legal concept. Amazingly the jury would sit there like they knew what the judge was talking about.

I sort of tend to deal in examples. You appreciate I trust that in your life and in my life every day, every day we make hundreds of decisions literally. It is how we get through the day. Some of them are almost mindless in there importance.

I use this as an example of that when you got up this morning you put your shoes on. Think back to when you got back up this morning and put your shoes on. How much thought did you spend this morning on the following question: I wonder what shoe I will put on first today?

I will answer for you just like you would have if called upon. I put the shoes on just like I did every day of my life. I didn't think about it much. That is not true, you did think about it. It is a whole series of conscious decisions. Your eyes have to make observations to relay the information to the brain. The brain transmits information and instructions to the arms, the hands, the feet, the legs. Otherwise you would put your shoes up on your ears.

It is a whole series of conscious decisions. You can't put your shoes on in your sleep, not and stay happily married. It is a low level of decision making. Why? The consequences to your well being and your daily life are almost nil. If you get your shoe on the wrong foot you will change it because it hurts.

On the other hand suppose when you got up this morning you had to decide whether or not to get married. Who amongst you would not give a bit more thought to that question than the question of what shoe you will put on? Once again I answer for you. Bet you. Marriage is a biggie. Marriage is one of those decisions in life that will

smash you right up against the wall. It will get you physically, financially, emotionally, turn you every which way but loose. Before a sane man or woman enters into that allegedly holy state they want to know the who, the what, the when, and the God forbid the why.

To the extent that you, especially I would have to be convinced to get married, need you be convinced of the elements of the crime and this man's participation. You must be convinced of those elements and his participation as you would have to be convinced of a weighty matter in your own lives.

For indeed taking an oath to pass upon the guilt or innocence of a fellow human being is a weighty matter in your own life. That is the level at which you personally must arrive before you may raise your hand and say I will vote for guilty.

What is that level? I have no idea. There is no way I can tell you. Why? You are different human beings. As you are different human beings things will impress you differently. You have a different sense of values, a different sense of weight.

My wife and I have been married 36 years. Over that period I bet you we have made tens of thousands of familial decisions, joint decisions having to do with the family. But if you want to go out and buy furniture it takes heck of a lot more to convince my wife than it takes to convince me. She knows if she can get me into a store I will buy everything between me and the door to get out. I'm not an informed consumer. I'm a paranoid consumer. I'm a psychotic consumer.

On the other hand, my wife buys nothing before she steps on it, bounces on it, tastes it, holds it up to the light, asks four people she never met before in there what they think of it. That is a roll of Bounty. You should see her when she is buying sofas and everything, it is an experience.

We will make a joint decision. It takes a heck of a lot more to convince her than it takes to convince me. We

bring our individual experiences to bear on it. So you don't think that I pick on her. You go out to buy a car. My wife only asks one question. Will it show dirt? I live on a country road. Not does it have a mirror, does it come with a warranty, does it have all four tires? Does it show dirt? I live on a country road.

On the other hand I crawl around, look under the hood, look underneath, kick it, bang it, pretend I know what I'm doing, which I don't of course. It takes more to convince me to buy an automobile than it would to convince her.

The decision is a joint decision. I do not know at what level you individually will be said to be convinced beyond a reasonable doubt, the standard I just explained to you. Whatever that level is for you that is the level at which you must arrive before you can decide, Mrs. Lindsay, mark me down in the guilty column. Anything short of that level is not guilty.

Please note I am not telling you you must be convinced beyond all doubt, that is not the standard of law. It is not the duty of the State to convince you to a mathematical certainty of any of these elements. Let's be honest about it. If nobody got married until they were convinced beyond all doubt we would all be single. Why? Because we are human beings. We always have that nagging reticence in making important decisions. If something can go wrong it will happen to me. We give it a name, we call it Murphy's Law.

We are not talking about that nagging reticence. We are talking about a doubt to which you can ascribe a reason. I am not convinced of this because I do not believe this.

The reason itself has to be reasonable. You can't say don't believe that because it is raining outside. You can say that, but that is not reasonable. Indeed it is a reason, but it is not a reasonable reason. We are talking but [sic] being convinced beyond a doubt based upon reason, a reasonable doubt.

Also please note it must be the unanimous decision of 12. 12 of you must be convinced of all the elements beyond a reasonable doubt and convinced of his participation beyond a reasonable doubt before a verdict of guilt can be found.

Appellant's trial counsel objected to the instruction as follows:

MR. NILAND: I object to your instruction on reasonable doubt. I object to your using the example of marriage. I object to your using the example with respect to how you might personally make a determination of whether you would or wouldn't do something.

THE COURT: Which one is that?

MR. NILAND: You say when you go buy certain kinds of things.

\* \* \* \* \* \*

MR. NILAND: What I gather from the case was this. The danger of giving the example of an important thing in your life. It is one thing if you give an example, say you make an analysis of all the facts involved in an important decision in your life and you assess those facts and you then make your determination in the following way. If you are so convinced from the facts that you would act without reservation then you would not have a reasonable doubt.

THE COURT: That is a terrible instruction. I have never, and will never give that instruction. That was a bad instruction. That is not the requirement of law that you act without hesitation.

MR. NILAND: I didn't say act without hesitation. I'm saying when you give an example of getting married.

THE COURT: Yes.

MR. NILAND: You say this is the kind of example of—

THE COURT: An important decision.

MR. NILAND: —an act which is important in your life. The determination is one that you would make and it would be comparable to a reasonable doubt determination. I think it is a bad example.

THE COURT: You are fully protected on the record. I do think it is so. I know you don't want these things clarified. I know it has been and I would do exactly the same thing, I don't want the jury to have a clear idea of what we mean. I'm the judge, I do want them to have a clear idea.

MR. NILAND: I want them to have as clear idea as possible. With the divorce rate today, obviously a whole lot of people enter marriage with a whole lot less conviction.

THE COURT: To me that is the best example you can give.

However laudable it may be to attempt to translate sometimes abstract, sometimes ancient legal concepts and principles into prosaic images intended to better communicate meaning, great care must be exercised in undertaking such experiments, particularly in criminal jury trials. The danger lies, of course, mostly in the potential for unintentionally trivializing these important concepts and principles. We are not unmindful of the leeway that should be accorded trial courts in the matter of jury instructions. We note only that, in this instance, the court went too far in its creativity.

While no precise definition of reasonable doubt is required, the *Maryland Criminal Pattern Jury Instructions*, 2:02 (1991), sets out the following helpful guide for trial judges:

A reasonable doubt is a doubt founded upon reason. It is not fanciful doubt, a whimsical doubt or a capricious doubt. Proof beyond a reasonable doubt requires such proof as would convince you of the truth of a fact to the extent that you would be willing to act upon such belief without reservation in an important matter in your own business or personal affairs. However, if you are not satisfied of the defendant's guilt to that extent, then reasonable doubt exists and the defendant must be found not guilty.

The Court of Appeals has subsequently and generally blessed this proposed instruction. *Wills v. State*, 329 Md. 370, 383–84, 620 A.2d 295 (1993). Judges McAuliffe and Eldridge, in their concurring opinion in *Wills*, went so far as to urge trial judges to use uniformly the pattern instruction on reasonable doubt. *Wills*, 329 Md. at 388–92, 620 A.2d 295.

Justice Ginsburg, in her concurring in part opinion in the consolidated cases of *Victor v. Nebraska* and *Sandoval v. California,* 511 U.S. ——, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994), endorsed another pattern instruction that she believed conveys a "clear, straightforward, and accurate" definition of reasonable doubt:

"[T]he government has the burden of proving the defendant guilty beyond a reasonable doubt. Some of you may have served as jurors in civil cases, where you were told that it is only necessary to prove that a fact is more likely true than not true. In criminal cases, the government's proof must be more powerful than that. It must be beyond a reasonable doubt.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt. If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty. If on the other hand, you think there is a real possibility that he is not guilty, you must give him the benefit of the doubt and find him not guilty." Federal Judicial Center, Pattern Criminal Jury Instructions 17–18 (1987) (instruction 21)."

511 U.S. ——, 114 S.Ct. at 1253, 127 L.Ed.2d at 603. As she also observed, certain federal circuits, in recognition of the historical difficulties identified in defining properly reasonable doubt, have gone so far as to adopt positions forbidding their federal trial judges from instructing juries on reasonable doubt, unless specifically requested to do so by a jury (4th Cir.), or upholding a district court judge's refusal to give a definition of reasonable doubt even where the jury solicited one (7th Cir.). *Victor,* 511 U.S. at ——, 114 S.Ct. at 1252–53, 127 L.Ed.2d at 602.

Trial and appellate judges will continue to struggle with reasonable doubt instructions into the indefinite future. For appellate judges, the crux of that struggle, considered on a

case-by-case basis, involves asking oneself a question suggested by Justice Blackmun's opinion, concurring in part and dissenting in part, in *Victor:* "Does the instruction, taken as a whole, create a reasonable likelihood that the jury was misled or confused by a suggestion of an improperly high degree of doubt for acquittal or an improperly low degree of proof for conviction?" 511 U.S. at ——, 114 S.Ct. at 1254–55, 127 L.Ed.2d at 605. When we ask ourselves that question with regard to the case *sub judice,* we are compelled to answer it in the affirmative.

We find fault with the trial judge's effort here on a number of counts. The instructions failed to communicate clearly that the jury's decision, if to convict, must be made "without reservation" or the functional equivalent of that concept. It did not include even a reference to the disfavored "without hesitation" description. *See Wills,* 329 Md. at 383–4, 620 A.2d 295. There is nothing in the instruction that conveys to the jury the proper degree of certainty that the jury must have in order to find guilt.

The rambling nature of the particular instruction under review here heightens the danger of confusion and misunderstanding on the jury's part. Given the difficulty of the task at hand, a greater risk of failure to communicate accurately exists when one aspires to explain too much or inserts too many illustrations, disparate in their significance, in a definitional instruction. In the instant case, the trial judge, although he may have harbored more limited and benign purposes in doing so, made use of domestic exemplars of the shifting and relatively high or low thresholds of certitude that he or his wife may require before purchasing furniture or a car. He followed those with:

> Please note I am not telling you you must be convinced beyond all doubt, that is not the standard of law. It is not the duty of the State to convince you to a mathematical certainty of any of these elements. Let's be honest about it. If nobody got married until they were convinced beyond all doubt we would all be single. Why? Because we are human beings. *We always have that nagging reticence in*

*making important decisions.* If something can go wrong it will happen to me. We give it a name, we call it Murphy's Law.

*We are not talking about that nagging reticence. We are talking about a doubt to which you can ascribe a reason.* I am not convinced of this because I do not believe this.

The reason itself has to be reasonable. You can't say don't believe that because it is raining outside. You can say that, but that is not reasonable. Indeed, it is a reason, but it is not a reasonable reason. We are talking but [sic] being convinced beyond a doubt based upon reason, a reasonable doubt. (emphasis supplied).

While it is entirely appropriate to instruct a jury that a fanciful, speculative, imaginary, or mere possibility of doubt is not a reasonable doubt (*Victor*, 511 U.S. at ——, 114 S.Ct. at 1248, 127 L.Ed.2d at 597), the attempted elimination of "nagging reticence" from the definition of reasonable doubt, particularly in conjunction with the humble scenarios employed in the same context or in close proximity to such an explanation, very likely confused the jury as to the quantum of doubt necessary for an acquittal. Many human beings buy consumer goods, both small and large, on impulse. They ofttimes even get married on impulse. They also decline to do so based on no more articulable feelings than they could explain for acting to the contrary. In a criminal jury trial, it is the jury's province to assess the credibility of witnesses and to weigh all of the evidence. If, in performing these tasks in good conscience, an individual juror is left with a nagging, but perhaps scientifically unquantifiable, reticence to convict the defendant, why should that juror be dissuaded from voting his or her conscience because he or she is unable to articulate finitely that doubt?

The instant instruction also lacks a saving grace that the Supreme Court found in the challenged instruction in *Victor.* Justice O'Connor, delivering the opinion of the Court, commented:

Victor's primary argument is that equating a reasonable doubt with a "substantial doubt" overstated the degree of doubt necessary for acquittal. We agree that this construction is somewhat problematic. On the one hand, "substantial" means "not seeming or imaginary"; on the other, it means "that specified to a large degree." Webster's Third New International Dictionary, *supra*, at 2280.; The former is unexceptionable, as it informs the jury only that a reasonable doubt is something more than a speculative one; but the latter could imply a doubt greater than required for acquittal under [*In re* ] *Winship*, [397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) ]. Any ambiguity, however, is removed by reading the phrase in the context of the sentence in which it appears: "A reasonable doubt is an actual and substantial doubt ... *as distinguished from* a doubt rising from mere possibility, from bare imagination, or from fanciful conjecture." (emphasis added).

This explicit distinction between a substantial doubt and a fanciful conjecture was not present in the *Cage* [*v. Louisiana*, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990) ] instruction. We did say in that case that "the words 'substantial' and 'grave,' as they are commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard." But we did not hold that the reference to substantial doubt alone was sufficient to render the instruction unconstitutional *cf. Taylor v. Kentucky*, 436 U.S. [478] at 488, 98 S.Ct. 1930, 56 L.Ed.2d 468 (defining reasonable doubt, "though perhaps *not in itself reversible error*, often has been criticized as confusing") (emphasis added). Rather, we were concerned that the jury would interpret the term "substantial doubt" in parallel with the preceding reference to "grave uncertainty," leading to an overstatement of the doubt necessary to acquit. In the instruction given in Victor's case, the context makes clear that "substantial" is used in the sense of existence rather than magnitude of the doubt, so the same concern is not present.

In any event, the instruction provided an alternative definition of reasonable doubt: a doubt that would cause a reasonable person to hesitate to act. This is a formulation we have repeatedly approved, and to the extent the word substantial denotes the quantum of doubt necessary for acquittal, the hesitate to act standard gives a common-sense benchmark for just how substantial such a doubt must be. We therefore do not think it reasonably likely that the jury would have interpreted this instruction to indicate that the doubt must be anything other than a reasonable one. 511 U.S. ——, 114 S.Ct. at 1250, 127 L.Ed.2d at 599 (some internal citations omitted).

In the case *sub judice*, however, the trial judge, if given the opportunity, would presumably explain that his use of "nagging reticence" was the equivalent of *Victor's* "doubt arising from mere possibility, from bare imagination, or from fanciful conjecture." If that were the case, as we believe it must be, the instruction failed to distinguish "nagging reticence," in a manner equivalent to that found in *Victor*, from "an actual and substantial doubt" or to provide an alternative definition of reasonable doubt, expressed in *Victor* in terms of a doubt that would cause a reasonable person to hesitate to act.

We would be hard pressed to quarrel with a trial judge's intention to translate legal dogma for a lay jury. We are, however, of the opinion that the effort in this case blurred the concept of reasonable doubt to the extent that there is a reasonable likelihood that the jury applied the instruction in such a way as to require either a higher degree of doubt than is required for acquittal or a lower degree of proof for a finding of guilt than is required under the reasonable doubt standard.

Because appellant was denied an appropriate instruction to the jury on the critical issue of reasonable doubt, we shall reverse. In view of our disposition of appellant's second argument, we need not address his contention relative to the admissibility of appellant's statement to Detective Fulginiti.

**JUDGMENT REVERSED.**

**CASE REMANDED TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR A NEW TRIAL.**

**COSTS TO BE PAID BY PRINCE GEORGE'S COUNTY.**

GARRITY, J., dissents.

GARRITY, Judge, dissenting.

Although I agree with the majority that it is a far better practice to adhere closely to the Maryland Criminal Pattern Jury Instructions, in this matter I believe that the instruction explaining reasonable doubt, when considered as a whole, was not erroneous. Additionally, although the majority makes much of the "nagging reticence" phrase, that was not an assigned concern of defense counsel and was therefore not preserved for our review. In any event, the trial judge clearly distinguished "nagging reticence" from that of "being convinced beyond a doubt based upon a reason, a reasonable doubt."

The Court of Appeals in *Wills v. State,* 329 Md. 370, 620 A.2d 295 (1993), explained the scope of review by an appellate court when considering whether the jury has been given a proper explanation of the "reasonable doubt" standard:

On appeal the appellate court considers an explanation of reasonable doubt as a whole; it does not determine the propriety of an explanation from an isolated statement. It views the effect of a suspect statement on the jury in the light of the entire explanation.... [I]f the instruction is actually given but it is some way erroneous, the appellate court must determine whether the error is so prejudicial as to call for reversal or may be excused as harmless.

According to the majority, a principal shortcoming of the trial judge's effort in the case *sub judice* was his failure to communicate clearly that the jury's decision, if to convict, must be made "without hesitation," "without reservation," or the functional equivalent of that concept. *There is nothing in the instruction that conveys to the jury the*

*proper degree of certainty that the jury must have in order to find guilt.* (Emphasis added).

In his instruction given on reasonable doubt, and a juror's degree of certainty prior to casting a vote, the trial judge explained:

Let us return back to the State's burden, called the State's burden of proof. This burden of proof requires that the State of Maryland convince 12 of you, as I said, that crime has been committed, and Mr. Jason Lamont Joyner–Pitts is the actor. When I say convince twelve of you they must convince you beyond a reasonable doubt.

Of all the elements that together make up the crime of his involvement, this beyond a reasonable doubt is sort of a mouthful of lawyer talk. That phrase is the name that we in the law centuries ago attached to the state of mental conviction *at which you must arrive before you can put your hand and say I will vote for guilty on that. Anything short of that you must vote—not voting for guilty, you are squarely in the corner of innocence.*

\* \* \* \* \* \*

To the extent that you, especially I would have to be convinced to get married, need you be convinced of the elements of the crime and this man's participation. You must be convinced of those elements and his participation as you would have to be convinced of a weighty matter in your own lives.

For indeed taking an oath to pass upon the guilt or innocence of a fellow human being is a weighty matter in your own life. That is the level at which you personally must arrive before you may raise your hand and say I will vote for guilty.

\* \* \* \* \* \*

... I do not know at what level you individually will be said to be convinced beyond a reasonable doubt, the standard I just explained to you. Whatever that level is for you that is the level at which you must arrive before you can

decide, Mrs. Lindsay, mark me down in the guilty column. Anything short of that level is not guilty.

*Please note I am not telling you you must be convinced beyond all doubt, that is not the standard of law. It is not the duty of the State to convince you to a mathematical certainty of any of these elements.* Let's be honest about it. If nobody got married until they were convinced beyond all doubt we would all be single. Why? Because we are human beings. We always have that nagging reticence in making important decisions. If something can go wrong it will happen to me. We give it a name, we call it Murphy's Law.

We are not talking about that nagging reticence. We are talking about a doubt to which you can ascribe a reason. I am not convinced of this because I do not believe this.

The reason itself has to be reasonable. You can't say don't believe that because it is raining outside. You can say that, but that is not reasonable. Indeed it is a reason, but it is not a reasonable reason. We are talking but [sic] being convinced beyond a doubt based upon reason, a reasonable doubt.

Also please note it must be the unanimous decision of 12. Twelve of you must be convinced of all the elements beyond a reasonable doubt and convinced of his participation beyond a reasonable doubt before a verdict of guilt can be found. (Emphasis added).

As the majority recognizes, there is absolutely no requirement in assuring a juror's determination of being certain about his or her decision to vote for conviction to use the specific words "without hesitation" or "without reservation." Indeed, the Court in *Wills* made clear that the inclusion of "without hesitation" or "hesitate to act" phrases in the reasonable doubt standard

may tend to confuse the jury and that justice is better served by substituting the phrase "without reservation" for the "hesitant" verbiage. We can visualize, as the Commit-

tee [2] apparently did, that the jury, given the "hesitate" phrase in the instruction, may well think that, if they did not find the evidence sufficient to support a verdict of guilty "immediately," and if they did not reach a conviction without some debate, a reasonable doubt must exist because they "hesitated to act" or did not act "without hesitation."

*Id.* at 384.

When examining the instruction as a whole, with particular reference to the majority's concern over "certainty," we should consider that the trial judge made painstakingly certain that the jurors were instructed that their decision to vote for a guilty plea must be made only after analyzing each element in the case and then being satisfied that the State proved its case beyond a reasonable doubt. It is worth repeating that the trial judge emphasized that the phrase "reasonable doubt"

is the name that we in the law centuries ago attached to the state of mental conviction at which you must arrive before you can put your hand and say I will vote for guilty on that. Anything short of that you must vote—not voting for guilty, you are squarely in the corner of innocence.

Taking the instruction as a whole, I am firmly convinced that the jury was properly instructed on the concept of reasonable doubt and its need to establish guilt only by unanimously deciding that the State establish every needed element of the crime beyond a reasonable doubt before raising their hands to say, "I will vote for guilty."

Indeed, if one must be convinced beyond a reasonable doubt of an accused's guilt before casting a vote of conviction, the mere phrase "without reservation" is but a rote redundancy in its truest sense. Nevertheless, the basic admonition to each juror to be confident of their vote before casting it was well covered by the trial court. In any event, in this instance, the mere failure to recite the superfluous phrase "without hesitation" or "without reservation" was not improper because of

---

**2.** The Committee that fashioned the Maryland Pattern Jury Instruction—Criminal 1991 (MPJI–CR).

**452**

the court's use of equivalent language to define certainty. I would affirm.