705 A.2d 133

**Lawrence E. GREEN**

v.

**STATE of Maryland.**

**No. 719, Sept. Term, 1997.**

Court of Special Appeals of Maryland.

Feb. 3, 1998.

548

David J. Hare, Student Attorney Under Rule 16 (Stephen E. Harris, Public Defender and Martha Weisheit, Asst. Public Defender, on the brief), Baltimore, for appellant.

Devy Patterson Russell, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Patricia Jessamy, State's Atty. for Baltimore City, on the brief), Baltimore, for appellee.

Argued before HARRELL, HOLLANDER and THIEME, JJ.

HOLLANDER, Judge.

Lawrence E. Green, appellant, was convicted by a jury in the Circuit Court for Baltimore City of fourth degree burglary, in violation of Maryland Code (1957, 1996 Repl.Vol.), Article 27, § 32(a)(1). After Green was sentenced to two years of incarceration, he noted the instant appeal. Appellant presents three questions for our review, which we have rephrased slightly:

I. Did the trial court err in its instructions to the jury for the crime of burglary in the fourth degree?

II. Did the trial court abuse its discretion in restricting appellant's closing argument?

III. Did the trial court err in admitting appellant's response to police inquiries concerning his address?

Because we answer the first question in the affirmative, we decline to answer appellant's remaining questions. Accordingly, we shall reverse and remand.

## FACTUAL SUMMARY

On April 3, 1997, appellant was arrested and charged with fourth degree burglary of the home of a former girlfriend with whom appellant has a child. On May 7, 1997, appellant appeared for trial at the District Court for Baltimore City and requested a jury trial. Consequently, his case was promptly forwarded to the circuit court, and trial began there on May 9, 1997.

At trial, Sheila Marie McDougald ("McDougald"), appellant's former girlfriend, was the State's key witness. McDougald stated that, in the early morning hours of April 3, 1997, she awoke to find appellant on the top of the steps, coming into her residence, located at 4406 Pall Mall Road in Baltimore. Appellant seemed "high" and was carrying what appeared to be a "blade." [1] When McDougald asked appellant how he got into the residence, appellant allegedly replied, "don't you know I could rob you blind."

After waking the couple's eight-year-old son and McDougald's twelve-year-old niece, McDougald went downstairs and turned off the security alarm that had been activated by appellant's entrance into the residence. She then asked appellant again how he was able to enter her residence. Appellant did not respond, but he was "hooping and hollering and everything." She claimed appellant was upset, because he believed that she "had some man in [her] house, in [her] bed or something."

McDougald testified that she neither invited appellant into her home nor gave him permission to enter her residence. She determined that appellant gained access to her residence by "[taking] the hinges off the door in the front part of the basement to go through the laundry room. He took the hinges off of that, had the door up on the side and broke the back window .... he broke [a screen window] out and ... came through that way by opening up the ... window."

Although McDougald conceded that appellant had previously lived with her for a brief period, she claimed that appellant had not stayed with her during the week preceding the incident. She also stated that, on one occasion when appellant had stayed at her home, he left his painting tools at her residence. McDougald asserted, however, that appellant removed the tools at some point during the week prior to the incident in issue.

---

**1.** Appellant works as a painter and the police later determined that the blade was a paint scraper.

According to McDougald, her security company notified the police of the occurrence. McDougald had also instructed her niece to contact the police.

At approximately 6:10 a.m., Officer Carlton Simms responded to a call for a breaking and entering in progress at McDougald's residence. Upon his arrival, Officer Simms observed, through the open door of the residence, that appellant and McDougald were "arguing and fussing." After questioning McDougald, Officer Simms entered the basement in order to determine how appellant gained entry into the residence. There, he observed a window with a damaged locking mechanism.

Simms arrested appellant and questioned him about his address. According to Officer Simms, appellant acknowledged that he did not live at McDougald's residence. Instead, he stated that he resided at 2440 Keyworth Avenue. Officer Simms also testified that, during the booking process, appellant repeated that he lived at 2440 Keyworth Avenue.

After the defense motion for acquittal was denied, appellant testified in his own behalf. Appellant described his relationship with McDougald, stating:

> [McDougald] is my kid's mother. I've been knowing [sic] her for ten and a half years and we've been seeing each other on and off for that period of time.

> \* \* \*

> We may separate. Then we come back, separate and come back.

Appellant further explained that, during the time in question, he had been staying with McDougald, and he "would come up there and stay with her maybe a couple of days a week...." Appellant also claimed that he was with McDougald at her home on the night before the incident, and then decided to go out drinking with friends. He testified:

> I wanted to go out and hang out for awhile.... [S]he didn't want me to leave the house. She wanted me to be there with her and sometimes I drink with the fellows. And

she got a little uptight and I came back that morning. I rung [sic] the doorbell. I called her on the phone. I didn't get any answer. So I knew she usually got up about six-thirty. So I kind of [started] thinking is she all right, okay. I had to get to work. My paint stuff—my clothes are there, my paint material is there, all of that's there. I goes [sic] around the back and I had went [sic] in this morning before to get in the house.

In response to his counsel's inquiry concerning the reason he entered McDougald's residence through the window, appellant explained:

Because, again, usually she answers the door. This morning, I don't know what the problem was[.][S]he wouldn't answer the door or the phone. So I figured . . . maybe something is wrong or I mean, I didn't know. And I had to get my stuff to go to work. She knows I got to get my stuff to go to work. So I went in and proceeded to get my stuff to go to work and I went upstairs. I didn't think she'd make no big deal out of this. This happened before, this happened before, honestly, this happened before. And I went upstairs to get my stuff and she's looking at me kind of mad. I just said, well, you act like you had somebody in here last night and we wasn't really arguing. It was just one of them things, you know. Everybody has problems in their relationship. We were just having a problem at that time. So I proceeded down the steps. She went and cut the alarm off and the phone had rang [sic].

Appellant also contended that he had gained access to the house through the window on prior occasions, because "[McDougald] would not distribute the key to me because she wants control, okay. And a lot of times when she had to go somewhere in the evening, I will tell her, well, I know how to get in, you know, I'll be there when you get there."

At the close of the evidence, defense counsel renewed her motion for judgment of acquittal, which the court denied. The court and defense counsel then engaged in the following exchange with respect to jury instructions:

[DEFENSE COUNSEL]: See, I don't know that the pattern—I was looking at an old pattern book I believe, but I don't know that that one goes into that there has to be a criminal intent. There does have to be a criminal intent. I have case law on it, *Warfield v. State* [315 Md. 474, 554 A.2d 1238 (1989) ]. I have the case.

THE COURT: I'm giving the pattern jury instruction.

[DEFENSE COUNSEL]: Does it say anything about necessary intent?

THE COURT: I'm giving the pattern jury instruction. Either it does or it doesn't. If you want to take an exception to it later you can, but that's the instruction that I'm giving.

[DEFENSE COUNSEL]: Okay, but can I just tell you one thing? I do have a case, *Warfield v. State*, which specifically addresses this issue, not the jury instruction issue, but the issue of whether there is a criminal intent necessary.

THE COURT: This is an annotation that is part of the pattern jury instruction, but I'm giving the pattern jury instruction.

[DEFENSE COUNSEL]: Okay.

Thereafter, the court charged the jury concerning fourth degree burglary. The court said, in pertinent part:

In order to convict the defendant, the State must prove, one, that there was a breaking, two, that there was an entry, three, that the breaking and entering was into someone else's dwelling house, and, four, that the defendant was the person who committed the breaking and entering.

Breaking means the creation of an opening such as a breaking or opening of a window or pushing open a door.

Defense counsel timely noted her exception to the instruction. The following colloquy is relevant:

[DEFENSE COUNSEL]: Yes, I would like that you include in your instruction that he had to have believed that he was not—that his entry was unwarranted, unlicensed, or

unprivileged, because based on what you're saying I think it's very misleading. It makes it like it's a—

THE COURT: I am giving the pattern jury instruction.

[DEFENSE COUNSEL]: I know.

THE COURT: It's not a specific intent that's required. It is a general intent.

[DEFENSE COUNSEL]: Yes.

THE COURT: And if you want to argue that he did not have the intent and he has to have some sort of general intent, you're perfectly welcome. You can do that, but I've given them the instruction—

[DEFENSE COUNSEL]: I know, but your instruction makes it sound like a strict liability crime which it's not, which this case *Warfield* specifically says it is not.

THE COURT: I didn't make it sound like a strict liability crime.

[DEFENSE COUNSEL]: Well, it sounds like if you go into the home of another you're guilty.

THE COURT: If you want to argue that he didn't intend to do it, he'd done it in the past, he thought that this was perfectly all right with her, that's fine. You make that argument. I think that under the case you've cited a specific intent is not called for but it does require a general intent that you can argue that he did not have the intent. Be my guest.

During appellant's closing argument, the court did not permit defense counsel to argue that appellant lacked criminal intent when he entered McDougald's residence. The following colloquy is illustrative:

[DEFENSE COUNSEL]: Thank you, Your Honor. Ladies and gentlemen, to find [appellant] guilty you have to—the State must prove that he had the intent, the criminal intent that's necessary to sustain a conviction for breaking and entering and that simply is not here.

[THE STATE]: I would object, Your Honor.

THE COURT: All right—

[THE STATE]: To the reference of criminal intent.

The discussion continued at the bench:

[DEFENSE COUNSEL]: I'm saying that the State has to prove that he had criminal intent.

THE COURT: No, you may not say that. They don't have to prove that.

[DEFENSE COUNSEL]: They don't have to prove that—

THE COURT: No, ma'am, that is not an element of the crime in this case. No specific intent has to be proven. It's a general intent crime. So you may argue that he did not intend to do it, but the State does not have to prove intent. . . .

The court then instructed the jury that it was to disregard the statements that defense counsel had made. Subsequently, when defense counsel asserted that the jury had "to find . . . that [appellant] had a criminal intent," the court again sustained the State's objection and told the jury to disregard defense counsel's remark. At another bench conference, the court admonished defense counsel that she could "argue that [appellant] did not intend to break and enter but that's different from saying the State has to prove criminal intent. . . ." The following colloquy ensued:

[DEFENSE COUNSEL]: Well, okay, but I just said that they have to believe that he had the criminal intent, that he had—

THE COURT: No, they don't. No, they don't.

[DEFENSE COUNSEL]: They don't have to believe that he had the criminal intent[?]

THE COURT: No.

[DEFENSE COUNSEL]: To find him guilty[?]

THE COURT: No, you may argue that he did not intend to break into the house, but the elements that I read to them are what they, the State has to prove and what factual findings they have to make, and part of that is a general intention. . . .

[DEFENSE COUNSEL]: But you've given me no defense.

THE COURT: I don't agree with you.

During the remaining course of her closing, defense counsel revisited the topic of appellant's intent:

[DEFENSE COUNSEL]: Now, what else—why does this make sense? He knew he set the alarm off. He knew that the alarm was going to trigger a 911 call and the police were going to be coming to the home. Did he run away? No, he stayed there because he felt like he had every right to stay there. You can't be found guilty of this crime unless you have a criminal intent, unless you believe—

[THE STATE]: Objection.

THE COURT: Sustained and I instruct the jury to disregard what the defense attorney just said.

Defense counsel then resumed her closing:

[DEFENSE COUNSEL]: What else makes sense about this? They say that when he's arrested, he has the paint scraper. He works as a painter. Even Ms. McDougald tells you that he works as a painter. Ladies and gentlemen, you simply cannot find this man guilty of this crime. That would mean that every time you went into the home if you had a relative or something, that you had left something in their home and you went in to get it and you couldn't get it, you could be arrested and charged with breaking and entering.

[THE STATE]: Objection.

THE COURT: Sustained. Golden rule, disregard what this defense attorney just said.

We will include additional facts in our discussion.

## DISCUSSION

### A.

As we noted, appellant was convicted of fourth degree burglary, pursuant to Code, Article 27, § 32. It provides, in part:

(a) *Breaking and entering dwelling or storehouse.*—(1) A person may not break and enter the dwelling of another. (2) A person may not break and enter the storehouse of another.

* * *

(d) *Penalty.*—A person who violates this section is guilty of the misdemeanor of burglary in the fourth degree and on conviction is subject to imprisonment for not more than 3 years.

In instructing the jury as to the elements of this offense, the court's charge, which we quoted earlier, was taken almost verbatim from section 4:06.3 of the Maryland Criminal Pattern Jury Instructions. *See* Maryland State Bar Ass'n, *Maryland Criminal Pattern Jury Instructions* 4:06.3, at 148 (1986, 1995 Supp.). Relying on *Warfield v. State*, 315 Md. 474, 554 A.2d 1238 (1989), appellant urged the trial court to expand on the pattern instruction. In essence, appellant argued that the court's instructions were deficient because they failed to inform the jury about the element of intent. Appellant contends that the evidence adduced at trial showed that he reasonably believed he had implied permission to enter McDougald's residence, which constituted a defense to the charge under *Warfield.* Thus, he argues that the court should have instructed the jury that, in order to convict, appellant had to know that "his entry was unwarranted, unlicensed, or unprivileged." We agree.

In *Warfield,* 315 Md. 474, 554 A.2d 1238, the Court discussed Maryland Code (1957, 1987 Repl.Vol.), Article 27, §§ 31A and 31B, which then contained the statutory misdemeanor of breaking and entering "the dwelling house of another" (§ 31A) and so called "storehouse" breaking and entering (§ 31B). These offenses are now codified in Code, Article 27, § 32. The Court characterized both offenses as forms of criminal trespass, in that they "proscribe the intrusion upon the property of another *with the general intent to break and enter but without the specific intent to commit a*

*crime therein." Id.* at 498, 554 A.2d 1238 (emphasis added). In addressing the criminal intent requirement applicable to section 31A, the *Warfield* Court said:

"The gravamen of the offense is the breaking and entering of the dwelling of another. To be convicted of statutory breaking and entering, as is evident from the legislative intent of the bill, no intent to commit a felony or to steal personal property need be shown.... The misdemeanor crime of statutory breaking and entering, therefore, is a nebulous one as it relates to the intent of the perpetrator, since no showing of any particular intent is required for a conviction under art. 27, § 31A. All that must be shown is that the perpetrator broke and entered a dwelling place of another."

*Id.* at 496, 554 A.2d 1238 (quoting *Bane v. State,* 73 Md.App. 135, 149–50, 533 A.2d 309 (1987)).

As a violation of § 31A was *malum in se,* however, the Court reasoned that proof of a general intent to break and enter is required. The Court said:

*A criminal intent requirement is usually implied in the case of a statutory offense which is malum in se. The general rule is that when an act malum in se is made a crime by statute, the statute is to be construed in the light of the common law, and the existence of criminal intent is essential.... [A]lthough [the offense of breaking and entering the dwelling house of another] does not call for a specific intent, it does require proof of a general intent to break and enter.*

*Id.* at 497, 554 A.2d 1238 (citations omitted) (emphasis added).

We pause to consider the import of the Court's comments as to intent, especially in the context of a stranger to the owner or occupant, who intentionally enters the property of another, but without the intent to commit another wrong once inside. The *Warfield* Court sought to explain that criminal trespass ordinarily occurs when a person breaks and enters the property of another, without more. The entry upon the property of another is the focus, even if the actor does not intend to do

any other act once upon the property. Consequently, the offense does not require a specific intent. There must, however, be a wrongful intent to enter the property itself, which is what the Court characterized as a general intent to enter the property. To illustrate, one who is kidnapped and brought unwillingly into the home of another would not, of course, be guilty of violating Article 27, § 32.

Perkins and Boyce explain the distinction between specific intent and general intent in their treatise:

> When, by definition, a crime consists of a designated act without reference to an intent to achieve a further consequence, the intent to do the proscribed act makes the crime a "general criminal intent offense;" when an attempt to achieve some additional consequence is required by definition, it is a "specific intent" offense.

Rollin M. Perkins & Ronald N. Boyce, *Criminal Law* 851 n. 1 (3d ed.1982) (quoting *People v. Love*, 111 Cal.App.3d Supp. 1, 168 Cal.Rptr. 591, 600 (1980)).

To be sure, the line between specific intent and general intent may at times become blurred. At least one criminal law scholar recognizes that judicial decisions, case law, and many penal codes "use a variety of terms to describe culpable mental states," including general intent and specific intent. Charles E. Torcia, *Wharton's Criminal Law* § 27, at 165 (15th ed.1993). As a result,

> Many of [these] terms are used indiscriminately and, to a large extent, are not defined; whatever light is shed on the meaning of defined terms becomes obscured by the failure to define seemingly synonymous terms; some terms are used interchangeably but not always consistently; the meanings of some terms overlap or shade into one another; and terms are not sharply distinguished one from another to show that some differ in kind while others differ only in degree.

*Id.* at 165–66.

In any event, the Court in *Warfield* rejected any notion that trespass or breaking and entering is a strict liability offense.

*Warfield,* 315 Md. at 500, 554 A.2d 1238. To the contrary, it recognized that there are situations when a person intentionally enters the property of another, based on a reasonable belief that it is permissible to do so. In that circumstance, one is not necessarily criminally culpable, notwithstanding the actual intent to enter.

In order to be guilty of criminal trespass, even when one *intends* to enter the property of another, the *Warfield* Court made clear that one must be "aware of the fact that he is making an unwarranted intrusion." *Id.* at 498, 554 A.2d 1238. Indeed, the Court quoted with approval the following passage from the Model Penal Code:

> "The knowledge requirement is designed primarily to exclude from criminal liability both the inadvertent trespasser and the trespasser who believes that he has received an express or implied permission to enter or remain."

*Id.* at 499, 554 A.2d 1238 (quoting 2 Model Penal Code and Commentaries § 221.2, comment (2)(a), at 88 (1980)).

■ It follows that, in a prosecution for criminal trespass, "it is an affirmative defense ... if 'the actor reasonably believed that the owner of the premises ... would have licensed him to enter....' " *Id.* (Quoting 2 Model Penal Code and Commentaries § 221.2(3)(c), at 144). Consequently, a defendant is not culpable if his "belief is reasonable, that is, a belief [that] is not reckless or negligent...." *Id. See* Model Penal Code and Commentaries § 221.2, comment (2)(a), at 88. What the Court said in *Warfield* is noteworthy here:

> [T]he [L]egislature intended that the intrusion, to be culpable, [must] be with an awareness that it was unwarranted— lacking authority, license, privilege, invitation, or legality. *To make culpable the inadvertent trespasser and the trespasser who entertains a reasonable belief that his conduct was proper would be unreasonable, illogical, inconsistent with common sense, and contrary to the interests of justice.*

*Warfield,* 315 Md. at 500, 554 A.2d 1238 (emphasis added).

■ In the case *sub judice,* the issue of implied permission was clearly generated by the defense's evidence. The defense

contended that appellant reasonably believed he had permission to enter McDougald's residence. It was undisputed, for example, that McDougald was the mother of appellant's young son, and McDougald conceded that appellant had previously lived with her. According to appellant, he and McDougald had an "on and off" relationship that continued for about "ten and a half years." Appellant also testified that he typically "would come up there and stay with [McDougald] maybe a couple of days a week . . . .", and that he had even stayed with McDougald the night before the incident. Appellant also claimed he had left his work tools at McDougald's residence on a prior occasion, and had previously gained access to her residence by entering the basement window. Moreover, on the morning in question, he claimed he needed his tools for work. Further, appellant implied that McDougald refused to answer the door because she was mad at him because he went drinking with his friends the night before.

Without question, the jury might have rejected appellant's explanation of events. In view of the court's instructions, however, the jury was never called upon to judge the credibility of appellant or resolve the conflicting versions of events. Instead, based on the court's instructions, the jury had little choice but to convict; the court told the jury that, in order to convict appellant, the State only had to prove that there was a breaking, followed by an entry into McDougald's dwelling, and that it was appellant who committed the breaking and entering. These facts were never in dispute, however. Yet the court refused to advise the jury that it could not convict appellant unless he entered McDougald's dwelling "with an awareness that it was unwarranted—lacking authority, license, privilege, invitation, or legality." *Warfield,* 315 Md. at 500, 554 A.2d 1238.

We recognize that the difficulty here resulted from the court's understandable desire to rely on the pattern instructions. We appreciate the court's interest in adhering strictly to the pattern jury instructions, which serve as a useful and important roadmap for trial judges. *See Rajnic v. State,* 106 Md.App. 286, 291 n. 1, 664 A.2d 432 (1995); *see generally*

*Wills v. State,* 329 Md. 370, 620 A.2d 295 (1993). Indeed, appellate courts have chastised trial judges for deviating from the model burden of proof instructions. *See, e.g., Merzbacher v. State,* 346 Md. 391, 404, 697 A.2d 432 (1997); *Wills,* 329 Md. at 383–84, 620 A.2d 295; *Williams v. State,* 322 Md. 35, 44–45, 585 A.2d 209 (1991); *Joyner–Pitts v. State,* 101 Md.App. 429, 442, 647 A.2d 116 (1994); *Himple v. State,* 101 Md.App. 579, 584–85, 647 A.2d 1240 (1994). Nevertheless, the pattern instructions are not comparable to rules of evidence. They serve as a valuable resource tool, but they do not necessarily fit every conceivable situation. Therefore, they cannot be followed without consideration of the particular circumstances of each case.

■ Here, although the pattern instruction was correct, it was not adequate, because it did not encompass the valid defense asserted by appellant. When the evidence generates an issue that is not covered by a pattern instruction, we must count on the court to incorporate relevant and valid legal principles gleaned from the case law.

■ Maryland Rule 4–325(c) provides:

**(c) How Given.**—The court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding. The court may give its instructions orally or, with the consent of the parties, in writing instead of orally. The court need not grant a requested instruction if the matter is fairly covered by instructions actually given.

It is beyond cavil that a trial court must properly instruct the jury on a point of law that is supported by some evidence in the record. *See Dykes v. State,* 319 Md. 206, 220, 571 A.2d 1251 (1990); *Wiegmann v. State,* 118 Md.App. 317, 349, 702 A.2d 928, 943–44 (1997). Indeed, " 'it is incumbent upon the court, . . . when requested in a criminal case, to give an instruction on every essential question or point of law supported by the evidence.' " *Robertson v. State,* 112 Md.App. 366, 374, 685 A.2d 805 (1996) (quoting *Bruce v. State,* 218 Md. 87, 97, 145 A.2d 428 (1958)). *Accord Gunning v. State,* 347

Md. 332, 347, 701 A.2d 374 (1997); *Smith v. State*, 302 Md. 175, 179, 486 A.2d 196 (1985); *Pulley v. State*, 38 Md.App. 682, 686, 382 A.2d 621 (1978); *Couser v. State*, 36 Md.App. 485, 499, 374 A.2d 399 (1977), *aff'd*, 282 Md. 125, 383 A.2d 389, *cert. denied*, 439 U.S. 852, 99 S.Ct. 158, 58 L.Ed.2d 156 (1978). This is because "a defendant is generally entitled to present his theory of the case through a requested instruction when there is evidence before the jury that supports it." *Robertson*, 112 Md.App. at 375, 685 A.2d 805; *see Johnson v. State*, 303 Md. 487, 512, 495 A.2d 1 (1985), *cert. denied*, 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986).

 On the other hand, a trial court is not required to give a specific instruction unless: (1) it constitutes an accurate statement of the law; (2) it is applicable to the facts and circumstances of the case; and (3) it is not otherwise fairly covered by the other instructions. *Mack v. State*, 300 Md. 583, 592, 479 A.2d 1344 (1984); *see Ellison v. State*, 104 Md.App. 655, 660, 657 A.2d 402, *cert. denied*, 340 Md. 216, 665 A.2d 1058 (1995). We explained in *Robertson*:

> The main purpose of a jury instruction is to aid the jury in clearly understanding the case and considering the testimony; to provide guidance for the jury's deliberations by directing their attention to the legal principles that apply to and govern the facts in the case; and to ensure that the jury is informed of the law so that it can arrive at a fair and just verdict. Accurate jury instructions are also essential for safeguarding a defendant's right to a fair trial. The court's instructions should fairly and adequately protect an accused's rights by covering the controlling issues of the case. It follows, therefore, that a criminal defendant is entitled to have presented to the jury instructions relating to a theory of defense for which there is sufficient support in the evidence, though the evidence has been impeached or is otherwise controverted by evidence of the State.

*Robertson*, 112 Md.App. at 385, 685 A.2d 805 (citation omitted); *see Chambers v. State*, 337 Md. 44, 48, 650 A.2d 727 (1994).

In view of the court's failure to give an instruction that included the defense asserted here, we must reverse and remand for a new trial. *Robertson*, 112 Md.App. at 387–88, 685 A.2d 805; *see State v. Martin*, 329 Md. 351, 356–57, 619 A.2d 992, *cert. denied*, 510 U.S. 855, 114 S.Ct. 161, 126 L.Ed.2d 122 (1993); *Pulley*, 38 Md.App. at 688, 382 A.2d 621.

## B.

Appellant asserts that the trial court improperly restricted defense counsel's closing argument by not permitting defense counsel to argue that the State was required to prove intent. He further posits that the court erred by inviting counsel to argue the issue of intent and thereafter refusing to allow counsel to inform the jury that the State was required to prove that appellant had criminal intent. In light of our holding that the court erred in refusing to charge the jury in accordance with appellant's proposed jury instruction, we need not address the merits of this issue.

## C.

Appellant further contends that the trial court improperly permitted Officer Simms to testify concerning appellant's statements, made both at the scene and during booking, that he lived at 2440 Keyworth Avenue. Based on the facts of this case, appellant asserts these statements were potentially incriminating and "there was no showing that it was made subsequent to his advisement of rights under *Miranda*." The State counters that because this issue was not addressed until appellant's trial, it is not preserved. The State complains that the matter "was not litigated at a pre-trial motion to suppress hearing."

As we noted, this case was transferred from the District Court based on appellant's prayer for a jury trial. Maryland Rule 4–301 provides, in part, that, upon transfer to circuit court, the pretrial procedures in circuit court are governed by the rules of the District Court:

**(b) Demand for Jury Trial.**—Upon a demand by the defendant for jury trial that deprives the District Court of

jurisdiction pursuant to law, the clerk may serve a circuit court summons on the defendant requiring an appearance in the circuit court at a specified date and time. The clerk shall promptly transmit the case file to the clerk of the circuit court, who shall then file the charging document and, if the defendant was not served a circuit court summons by the clerk of the District Court, notify the defendant to appear before the circuit court. The circuit court shall proceed in accordance with Rule 4-213(c) as if the appearance were by reason of execution of a warrant. *Thereafter, except for the requirements of Code, Article 27, § 591 and Rule 4-271(a), or unless the circuit court orders otherwise, pretrial procedures shall be governed by the rules in this Title applicable in the District Court.*

(Emphasis added).

Maryland Rule 4-251 governs motions filed in District Court. Pursuant to Rule 4-251(b), a motion to suppress filed before trial in a District Court case is determined at trial. The rule, however, does not require that the motion to suppress be made before trial. Rule 4-251 states, in part:

(a) **Content.**—A motion filed before trial in District Court shall be in writing unless the court otherwise directs, shall state the grounds upon which it is made, and shall set forth the relief sought. A motion alleging an illegal source of information as the basis for probable cause must be supported by precise and specific factual averments.

(b) **Determination.**—A motion asserting a defect in the charging document other than its failure to show jurisdiction in the court or its failure to charge an offense shall be made and determined before the first witness is sworn or evidence is received on the merits, whichever is earlier. *A motion filed before trial to suppress evidence or to exclude evidence by reason of any objection or defense shall be determined at trial.* Other motions may be determined at any appropriate time.

(Emphasis added).

A review of the record indicates that appellant did not file a pre-trial motion to suppress Officer Simms's statement. In-

stead, at trial, appellant's counsel objected to Officer Simms's testimony about the statements appellant made at the time of his arrest, although she did not provide any reason for the objection. Instead, appellant first raised the issue of a *Miranda*[2] violation in his brief to this Court. Consequently, the trial court was not presented with the opportunity to address and resolve appellant's claim as to a *Miranda* violation.

In light of our holding in the case, we need not reach the State's preservation claim. On remand, appellant may pursue his claim by way of a motion to suppress, which the trial court may consider in an appropriate proceeding.

**JUDGMENT REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR A NEW TRIAL.**

**COSTS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.**

---

2. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).