724 A.2d 693

**Frederick HERD**

v.

**STATE of Maryland.**

**No. 14, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

Feb. 24, 1999.

78

Michael Rosofsky (Durkee & Rosofsky, on the brief), Reisterstown, MD, for appellant.

Regina Hollins Lewis, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General and Patricia Jessamy, State's Attorney for Baltimore City, on the brief), Baltimore, MD, for appellee.

Before MOYLAN, KENNEY and RALPH BURNETT (Specially Assigned), JJ.

MOYLAN, Judge.

The appellant, Frederick Herd, was convicted in the Circuit Court for Baltimore City by Judge Paul A. Smith, sitting without a jury, of burglary in the fourth degree. The appellant, a licensed bailbondsman, asserted as a defense his allegedly reasonable belief that he was entitled to enter the premises in question.

■ Before even reciting the list of subtle and perplexing issues raised by this appeal, it behooves us to note that this case was submitted to Judge Smith on an agreed statement of facts. It should serve as a classic illustration of the frequently overlooked truth that simply because a defendant submits on an agreed statement of facts, forbearing to require the State to call a single fact witness and abjuring any right to cross-examine a single accuser, such a choice of trial modalities by no means implies that the procedure is the functional equivalent of a guilty plea. In this regard, see *Atkinson v. State,* 331 Md. 199, 203 n. 3, 627 A.2d 1019 (1993) ("Although this procedure should not be used when there are significant witness credibility questions, *we have approved of it in the past when the parties sought to argue solely legal questions at trial.*" (Emphasis supplied)); *Ingersoll v. State,* 65 Md.App. 753, 761, 501 A.2d 1373 (1986) ("We conclude, as we did in *Ward,* that neither the reported cases of the Court of Appeals nor of this Court 'stand for the broad proposition that any "not guilty plea with an agreed statement of facts" is now to

be regarded as "the functional equivalent to a guilty plea." ' ");
*Ward v. State,* 52 Md.App. 664, 670–73, 451 A.2d 1243 (1982).

No mere functional equivalent of a guilty plea would give rise to the fiercely contested legal issues with which the trial judge had to grapple and with which we must now contend:

1) What precisely is the *mens rea* of fourth-degree burglary and what is the impact on that *mens rea* of a defendant's reasonable belief that he was entitled to make the intrusion in question?

2) With respect to such reasonable belief (or the absence thereof), to which party is allocated 1) the burden of initial production, 2) the burden of ultimate persuasion, and 3) what is the level of persuasion that must be satisfied by the party carrying that burden?

3) Did the trial judge, sitting as a jury, apply the appropriate burden of persuasion, both as to its allocation and as to its required level of certainty, to his ultimate, conclusory fact finding on this issue of reasonable belief?

4) Were the uncontested facts, recited in the agreed statement, legally sufficient to support the verdict?

### The Agreed Statement of Facts

The narrative of events set out in the agreed statement of facts self-evidently was not in dispute. Frederick Herd, the appellant, was at all relevant times employed by Courtside Bail Bonds (hereinafter "Courtside") as a bail bondsman. Herd's duties included the apprehension and arrest of fugitives.

On August 9, 1996 Steven Weiner, the operator of Courtside, informed Herd that James Askins, one of Courtside's clientele, had failed to appear for trial and that a warrant had been issued for Askins's arrest. Askins had been released on a bond of $10,000 put up by Courtside on the charge of violation of probation. Herd was instructed by Weiner to find Askins. Accordingly, Herd, Weiner, and two other bail bondsmen (Parsons and Doran) employed by Courtside went to Askins's last known address at East Madison Street. While at

that residence the three men "learned that Mr. Askins was no longer residing at the Madison Street address." They were advised by a female that Askins "was presently staying at 924 Abbott Court, which is also located in Baltimore City." No further details were provided regarding what relationship, if any, that woman may have had to Askins. Herd and his companions then went to 924 Abbott Court in an attempt to locate Askins. The men knocked on the door of the residence but no one answered. According to Herd, the men could hear sounds of a radio coming from within the house and "the blinds at the second floor window showed signs of movement." At that point Herd and his companions forcibly entered the residence by breaking the lock off the front door with an axe. After entry and a sweep of the premises, the men realized that no one was inside the residence.

Ms. Louise Holland, a resident of 926 Abbott Court, heard banging at her window on the evening of 9 August 1996. When she looked outside she noticed a white male walking out of her yard. Ms. Holland continued to watch as the four men broke down the door of 924 Abbott Court with an axe.

During the course of the forcible entry into 924 Abbott Court, Ms. Michelle Reed, the lawful resident of that address, returned home with two of her children. On approaching her residence, Ms. Reed was informed by neighbors that the police were in her house. She then noticed that there were men in her home. At that point one of the men asked Ms. Reed to come inside the residence and told her they had some questions. According to Ms. Reed, she requested from the men both identification and a search warrant, but they provided her with neither. Instead, they informed her only that they were "from the fugitive unit." Ms. Reed noticed that the men were armed and that at least one of the men was wearing a bullet proof vest. Ms. Reed was then presented with a photograph of Askins and asked whether she knew him. She replied that she did not. By that point, Ms. Reed was visibly upset, but the men continued to search her residence. At some point during the encounter, one of the men asked Ms. Reed how much she paid for day care services for her

children. When she replied to his question, the man offered her that amount of money. Ms. Reed refused to take it.

Ms. Reed told the men that she was going to call an attorney and the men departed. Because she was under the mistaken impression that the men who had been in her house were police officers, she called the Police Department to report that one of the "officers" had offered her a bribe (in attempting to give her money for day care services). When the police arrived they surveyed the damage done by the bail bondsmen. They also learned that no search warrant had been executed for that particular address on that day.

Later that evening, one of Ms. Reed's neighbors saw Herd at a gas station, realized that he was the same man who had broken into Ms. Reed's home, and recorded the license plate number of his vehicle. Thereafter, Courtside was contacted regarding the incident and further police investigation led to the ultimate arrest of Herd, Parsons, and Weiner.[1]

Approximately two-and-one-half weeks later during an interview at the State's Attorney's office, Parsons admitted to having broken the lock of Ms. Reed's door with an axe. Parsons, however, would provide no detail about the woman who had given the men the information that Askins could be found at 924 Abbott Court.

Although those facts themselves were not disputed, what was very hotly disputed was whether those facts could support a conviction for burglary in the fourth degree.

### Fourth–Degree Burglary

The offense which, since the recodification of the various burglary laws by Ch. 572 of the Laws of 1994, is now called burglary in the fourth degree embraces four varieties of proscribed conduct. That variety involved in the present case is spelled out by Art. 27, § 32(a)(1),[2] which provides:

---

1. The record does not reveal whether Doran was ever arrested or charged.

2. The new statutory crime of burglary in the fourth degree also embraces three other varieties of proscribed conduct. Section 32(a)(2)

> A person may not break and enter
> the dwelling of another.

The facts set out in the agreed statement unequivocally established the *actus reus* of fourth-degree burglary. The structure at 924 Abbott Court was indisputably a dwelling. Its lawful residents were indisputably Ms. Michelle Reed and two of her children. From the point of view of the appellant, therefore, 924 Abbott Court was indisputably the dwelling of another. When the appellant and his three companions broke down the door with an axe, that clearly qualified as a breaking. When they subsequently entered 924 Abbott Court, that unquestionably constituted an entering. Indisputably, the appellant broke and entered the dwelling of another.

At serious issue, however, is whether the statement of facts establishes the necessary *mens rea* to support the appellant's conviction. That raises the question of what precisely is the *mens rea* of that variety of fourth-degree burglary spelled out by § 32(a)(1).[3]

### The *Mens Rea* of Fourth–Degree Burglary

Three opinions by the Court of Appeals and by this Court have, in combination, thoroughly examined the *mens rea* of fourth-degree burglary of the breaking and entering variety, although they have not exhausted all of the procedural issues involved in the proof of that *mens rea*. The three cases, in

---

prohibits the breaking and entering of the storehouse of another. Prior to the 1994 recodification, that variety of criminal behavior was covered by Art. 27, § 31B.

Section 32(b) prohibits being in or on the dwelling or storehouse of another or being within the essential (albeit not technical) curtilage thereof "with the intent to commit theft." That variety of proscribed conduct had, prior to 1994, been part of the roguery and vagabondage statute, Art. 27, § 490.

Section 32(c) prohibits the possession of "burglar's tools" with the intent that they be used in the commission of a burglary-related offense. That variety of proscribed conduct had, prior to 1994, been another part of the roguery and vagabondage statute, Art. 27, § 490.

3. What we say in this opinion about the *mens rea* of § 32(a)(1) is also true about the *mens rea* of § 32(a)(2). It is not necessarily true, however, about the *mens rea* of either § 32(b) or § 32(c).

order of their being decided, are *Bane v. State,* 73 Md.App. 135, 533 A.2d 309 (1987); *Warfield v. State,* 315 Md. 474, 554 A.2d 1238 (1989); and *Green v. State,* 119 Md.App. 547, 705 A.2d 133 (1998).

## A. The Absence of Any Required Specific Intent:

█ The most prominent characteristic of the *mens rea* of that variety of fourth-degree burglary dealt with by § 32(a)(1) is that it creates a mere general-intent and not a specific-intent crime. That conclusion inexorably follows from looking at the four corners of the statute itself. Section 32(a)(1) expressly prohibits the breaking and entering of the dwelling of another and makes no mention of any specific intent that must accompany the breaking and/or entering. As in the case of any statutory crime, a special mental element, particularly a specific intent, would have to be expressly spelled out. None has been.

The same conclusion—to wit, that a fourth-degree breaking and entering requires no specific intent—follows from looking at the whole family of offenses covered by the reorganized and newly codified subtitle "Burglary and Related Offenses" and then looking at the special place of § 32(a)(1) within the larger legislative scheme. Section 35B (c) and (e) directs particular attention to the relationship among § 29 (first-degree burglary), § 31 (third-degree burglary), and § 32(a)(1) (fourth-degree burglary). Those subsections of § 35B expressly state, with respect to those three offenses involving the breaking and entering of a dwelling, that § 29 is the greater inclusive offense, that § 31 is the intermediate included and/or inclusive offense, and that § 32(a)(1) is the lesser included offense.[4]

Each of those three escalated criminal proscriptions prohibits the breaking and entering of the dwelling of another. The *actus reus* of all three crimes is exactly the same. The only differences are in the *mens rea.* The differences among the

---

4. There is an analogous relationship, with the same doctrinal consequences, between § 30 (second-degree burglary) and § 32(a)(2) (fourth-degree burglary of a storehouse). See § 35B(d).

three offenses involve only the existence of a particular specific intent or the absence of any such specific intent. Section 29 involves the specific intent to commit theft or a crime of violence in the burglarized dwelling. When that specific intent is present, the crime is a felony with a maximum term of imprisonment of twenty years. Section 31, the next step down on the ladder of blameworthiness, involves the lesser required specific intent to commit any crime in the burglarized dwelling. When such lesser specific intent is present, the crime is still a felony but is subject to a maximum term of imprisonment of only ten years. Section 32(a)(1), the final step down on the ladder of blameworthiness, does not require a specific intent to commit a crime of any sort in the burglarized dwelling or to do anything else for that matter. For that reason, the offense is only a misdemeanor subject to a maximum term of imprisonment of but three years. The absence of a specific intent is the only thing that distinguishes § 32(a)(1) from § 31.[5] Without that distinction, the legislative scheme would be an absurdity.

A third, and arguably redundant, proof of this less demanding *mens rea*—to wit, the lack of a specific intent requirement—can be found in the legislative history of the predecessor statute of what is now § 32(a)(1). That predecessor criminal provision was, prior to 1994, § 31A. It was enacted by Ch. 661 of the Laws of 1973. Judge Bloom thoroughly traced its legislative history for this Court in *Bane v. State*, 73 Md.App. 135, 147–52, 533 A.2d 309 (1987). He referred to the then new statute prohibiting the breaking and entering of a dwelling as a "late starter in the burglary field." [6]

---

**5.** One possible consequence of that distinction is that the voluntary intoxication that might preclude a conviction for first-degree burglary or third-degree burglary would not be a defense to a charge of fourth-degree burglary.

**6.** *See* Moylan, *The Historical Intertwining of Maryland's Burglary and Larceny Laws or the Singular Adventure of the Misunderstood Indictment Clerk,* 4 U.Balt.L.Rev. 29, 31 (1974).

The motivation for the new 1973 statute was the desire of the State's Attorneys of Maryland to have a lesser crime they could tactically fall back on in instances where they could readily prove the *actus reus* of breaking and entering but encountered difficulties of proof when it came to the *mens rea* of a particular specific intent. Judge Bloom explained, 73 Md.App. at 148–49, 533 A.2d 309:

> In 1973, the Maryland Senate Judicial Proceedings Committee received testimony from the State's Attorneys of various counties and Baltimore City that there was a need for a burglary offense of less severity than common law burglary or any of the then applicable statutory burglary-type crimes. *The existence of such an offense,* it was argued, *would facilitate prosecutors in the handling of cases in which the felonious intent, a required element of common law burglary and all of the then statutory burglary offenses, of the intruder could not be clearly shown.* Senate Bill 218 was drafted and submitted to the 1973 General Session with the intent of creating a criminal offense to comply with the State's Attorneys' wishes. Legislative Council of Maryland, Report to the General Assembly of 1973, at 122, item no. 187 (1973). *See also,* 1973 Journal of Proceedings of the Senate of Maryland—Regular Session 136. Senate Bill 218 was passed as introduced, without any amendments, by both houses of the Maryland General Assembly. *See,* 1973 Journal of Proceedings of the Senate of Maryland—Regular Session 136, 255, 274; 1973 Journal of Proceedings of the House of Delegates of Maryland—Regular Session 280, 2444, 2593. Governor Marvin Mandel signed the enrolled bill into law on May 24, 1973. 1973 Md.Laws 661. That law read, as it does now, as follows:
>
> > Any person who breaks and enters the dwelling house of another is guilty of a misdemeanor and, upon conviction thereof, shall be sentenced to imprisonment for a term of not more than three (3) years or a fine of not more than five hundred dollars ($500.00) or both.

Md.Code Ann. art. 27, § 31A (Repl.Vol.1982, Cum.Supp. 1987).

(Footnote omitted; emphasis supplied).

Judge Bloom characterized the new law as one involving an *actus reus* but no *mens rea* beyond the ordinary general intent to do the acts that constituted the *actus reus:*

> The gravamen of the offense is the breaking and entering of the dwelling of another. To be convicted of statutory breaking and entering, as is evident from the legislative intent of the bill, *no intent to commit a felony or to steal personal property need be shown. See,* R. Gilbert & C. Moylan, *Maryland Criminal Law—Practice and Procedure,* § 11.3 (1983), *see also,* Moylan, *supra,* 4 U.Balt.L.Rev. 29, 31 (1974). The misdemeanor crime of statutory breaking and entering, therefore, is a nebulous one as it relates to the intent of the perpetrator, since *no showing of any particular intent is required for a conviction* under art. 27, § 31A. All that must be shown is that the perpetrator broke and entered a dwelling place of another.

73 Md.App. at 149–50, 533 A.2d 309 (emphasis supplied).

In explaining in *Bane* why the breaking and entering of a dwelling was neither an infamous crime nor a *crimen falsi* nor a crime involving moral turpitude, this Court squarely held that, in terms of broad categories at least, the offense was a general-intent crime:

> Since *misdemeanor breaking and entering* involves no felonious or larcenous intent, it *is a crime of general intent* that includes within its scope a variety of acts, including some that are reckless or negligent. A conviction for that offense may result either from a well-planned scheme—or merely rash, impetuous conduct of a defendant.

73 Md.App. at 150, 533 A.2d 309 (citation omitted; emphasis supplied). *See also Hawkins v. State,* 291 Md. 688, 694, 436 A.2d 900 (1981).

## B. General Intent Includes Awareness That Intrusion Is Unwarranted:

Even a general intent, however, may involve something more than the mere voluntary doing of a physical act. In *Warfield v. State,* 315 Md. 474, 554 A.2d 1238 (1989), the Court of Appeals placed its imprimatur on *Bane v. State* and then, in a thorough analysis by Judge Orth, built upon it. In *Warfield,* to be sure, the Court of Appeals was literally dealing with what was then Art. 27, § 31B, proscribing the breaking and entering of a storehouse. It pointed out, however, that the *mens rea* of storehouse-breaking and-entering is indistinguishable from the *mens rea* of dwelling-house-breaking-and-entering.

As a result of the recodification of 1994, what had been § 31B is now § 32(a)(2), just as what had been § 31A is now § 32(a)(1). In the course of explaining why the *mens rea* of breaking and entering a storehouse (what was then § 31B) was precisely the same as the *mens rea* element of breaking and entering a dwelling (what was then § 31A), Judge Orth traced briefly the legislative history of § 31B. As earlier noted in *Bane,* § 31A (covering dwellings) had been placed in Article 27 in 1973 at the request of the Maryland State's Attorneys to facilitate the prosecution of those who break and enter dwellings in circumstances where it might be difficult to prove what, if any, further criminal intent those trespassers may have harbored. It was soon noted, however, that § 31A's limited coverage, restricted as it was to dwellings, left an obvious gap in the law. That gap was filled six years later by Ch. 598 of the Laws of 1979, which created § 31B. Judge Orth detailed the legislative history, 315 Md. at 497–98, 554 A.2d 1238:

> Section 31B was designed to fill the gap in § 31A by going beyond a dwelling house and including a bevy of structures and a boat. It was proposed in 1979 by H.B. 986 and assigned to the Judiciary Committee. Its progress through the legislative process to enactment was uneventful. Amendments from time to time did no more than add structures to be covered. An examination of the legislative

bill file reveals what prompted the introduction of the bill. A handwritten note, undated and unidentified reads:

> This bill makes it a crime to break into any of the listed structures. *This fills a gap in the law created by the fact that Sec. 31A of the code makes it a crime to break into a dwelling house*—but the courts have said that an unoccupied beach cottage is not a dwelling house.

(Emphasis supplied).

After noting "that all we have said about § 31A with respect to intent applies with equal force to § 31B," 315 Md. at 497, 554 A.2d 1238, Judge Orth went on to reaffirm that both crimes were merely general-intent rather than specific-intent offenses:

> [C]ommon law burglary and the various statutory burglary and breaking offenses, except for those crimes created by §§ 31A and 31B, require a specific intent beyond the general intent to break a structure. This is so be they felonies or misdemeanors and whether they speak of a breaking and entering or merely a breaking. *Sections 31A and 31B, however, do not have a specific intent as an element.*

315 Md. at 495, 554 A.2d 1238 (emphasis supplied).

> The similarity of the language of the two statutes and their legislative history clearly show that *§ 31B, like § 31A, does not embrace a specific intent but does require a general criminal intent to break and enter.*

315 Md. at 498, 554 A.2d 1238 (footnote omitted; emphasis supplied).

 That, of course, does not end the inquiry. A simple black-or-white classification of the *mens rea* as one involving a specific intent or one involving only a general intent is but a part of the necessary examination. An involuntary act—a muscular spasm or a fall, for example—would not render one guilty even of a crime *malum prohibitum* let alone a crime *malum in se.* Even a crime *malum prohibitum* requires a voluntary act. *Mens rea* literally means "a guilty mind." With respect to crimes *mala in se,* to wit, to crimes involving

a *mens rea*, even general intent may mean more than merely voluntarily doing the act that constitutes the *actus reus*.

Judge Orth began his further examination by stating that § 31A defined a crime that was *malum in se* rather than merely *malum prohibitum* and that, as such, the *mens rea* must, indeed, be criminal:

> A criminal intent requirement is usually implied in the case of a statutory offense which is *malum in se*. The general rule is that when an act *malum in se* is made a crime by statute, the statute is to be construed in the light of the common law, and the existence of criminal intent is essential.

315 Md. at 497, 554 A.2d 1238.

In explaining why §§ 31A and 31B were *mala in se,* thus requiring a criminal (albeit general) intent, the Court of Appeals began its analysis by pointing out that the two offenses were, in fact, specific instances of the broader common law crime known generally as "criminal trespass," notwithstanding the failure of the two statutes even to mention the word "trespass."

> *Sections 31A and 31B of Article 27 create the misdemeanors of criminal trespass.* Although not expressly so labeled and not included in the group of crimes under the subtitle "Trespass" in Article 27, §§ 31A and 31B proscribe the intrusion upon the property of another with the general intent to break and enter but without the specific intent to commit a crime therein. This is the hallmark of a criminal trespass.... Sections 31A and 31B clearly fall within the criminal trespass structures of other states, viewed schematically.

315 Md. at 498, 554 A.2d 1238 (footnote and citations omitted; emphasis supplied). By looking then to criminal trespass law generally for guidance, the Court further concluded that an integral aspect of the *mens rea* was an awareness that the intrusion was unwarranted:

The common requirement of criminal trespass offenses is that the actor be aware of the fact that he is making an unwarranted intrusion.

*Id.*

The *Warfield* opinion found persuasive § 221.2(1) of the Model Penal Code, which makes an intrusion culpable when the intruder knows that he is not licensed or privileged to intrude. The *Warfield* opinion quoted with approval the Commentary to that section, as it explained the purpose of the awareness requirement:

> The knowledge requirement is designed primarily to exclude from criminal liability both the inadvertent trespasser and the trespasser who believes that he has received an express or implied permission to enter or remain.

2 Model Penal Code and Commentaries § 221.2, comment 2(a), at 88 (1980).

Judge Orth explained that without the awareness requirement, §§ 31A and 31B would be, in effect, strict liability crimes, able to ensnare with undiscriminating tentacles all sorts of actors whom the Legislature never intended to treat as criminal:

> The literal meaning of §§ 31A and 31B could indicate that the legislature intended to impose strict liability on a person who intrudes upon the property of another. But when we apply the precepts of statutory construction and examine the literal language of the statutes in the light of their legislative history, their affinity to common law burglary and the statutory burglary and statutory breaking and entering offenses, and their status as criminal trespass offenses, we are satisfied that the legislature intended that the intrusion, to be culpable, be with an awareness that it was unwarranted—lacking authority, license, privilege, invitation, or legality. To make culpable the inadvertent trespasser and the trespasser who entertains a reasonable belief that his conduct was proper would be unreasonable, illogical,

inconsistent with common sense, and contrary to the interests of justice.

315 Md. at 500, 554 A.2d 1238.

 What *Bane* and *Warfield* held with respect to the *mens rea* of former §§ 31A and 31B applies, of course, with unattenuated vigor to what is now § 32(a)(1) and (2). The *mens rea* of these two instances of criminal trespass, now known in Maryland as fourth-degree burglary, includes no specific intent. The general intent to effectuate the *actus reus* of the trespass, however, includes an awareness that the trespass is unwarranted. Thus, a reasonable belief that the trespass is authorized, licensed, or privileged is a complete defense to the crime. This fully answers the first question that we posed at the outset of this opinion:

> What precisely is the *mens rea* of fourth-degree burglary and what is the impact on that *mens rea* of a defendant's reasonable belief that he was entitled to make the intrusion in question?

### Procedural Questions Still Unresolved by *Warfield*

The substantive content of the *mens rea* of these two varieties of fourth-degree burglary, however, is only a part of what we need to know. Knowing what the *probandum* is does not tell us who has to prove it. Must the State, in a vacuum, prove a negative, to wit, that the defendant lacked the reasonable belief that his intrusion was warranted? Or must the defendant prove affirmatively that he harbored such a reasonable belief? If the fact finder is in a state of equipoise on the issue, who wins the tie? If neither the State nor the defendant offers any evidence at all on the subject, who loses that classic nothing-to-nothing tie?

There are at least three plausible procedural and evidentiary modalities for handling the issue, but *Warfield* does not tell us which of these we should adopt.

▆▆▆▆▆

## A. A Reasonable Belief As An Affirmative Defense:

At one end of the burden-of-proof spectrum, the reasonable belief that an intrusion was warranted could readily be treated as a full-blown affirmative defense, in the most classical sense of that term. The Model Penal Code, to which the *Warfield* Court looked for guidance on this issue, has so treated the defense, as have several of the states. Judge Orth noted in this regard, 315 Md. at 499, 554 A.2d 1238:

> *The Model Penal Code provides that it is an affirmative defense to prosecution for criminal trespass if "the actor reasonably believed that the owner of the premises ... would have licensed him to enter ...."* Section 221.2(3)(c), at 144. The defense is available if the actor's belief is reasonable, that is, a belief which the actor is not reckless or negligent in holding. 2 Model Penal Code and Commentaries § 221.2, comment (2)(a), at 88. The comment notes that several states have adopted the Model Penal Code language to define the culpability for criminal trespass [and] *several [states] have adopted the affirmative defense provision.*

(Emphasis supplied).

▆▆ The label of **affirmative defense** is not some passing reference or casual allusion to any exculpatory theory advanced by the defense. It is a formal legal classification or category with very significant procedural consequences.[7] A

---

7. In this opinion, we use the term of art "affirmative defense" in its most restrictive sense as a defense that imposes on a defendant both the burden of production and the burden of ultimate persuasion. We use it as does 2 *McCormick on Evidence* (4th ed. 1992), § 347, pp. 481–82:

 Historically, many states placed both the burden of production and the burden of persuasion on the accused with regard to several classical affirmative defenses, including insanity and self-defense. (Footnotes omitted).

 This *is*, moreover, the sense in which the term was used at the common law. In *Martin v. Ohio*, 480 U.S. 228, 235, 107 S.Ct. 1098, 94 L.Ed.2d 267, 275 (1987), the Supreme Court noted:

 As we noted in *Patterson*, the common-law rule was that affirmative defenses, including self-defense, were matters for the defendant to prove. "This was the rule when the Fifth Amendment was adopted, and it was the American rule when the Fourteenth Amendment was ratified." 432 U.S. at 202, 97 S.Ct. 2319, 53 L.Ed.2d 281.

classic affirmative defense is something that the defendant must prove, not something that the State must disprove. With respect to such an affirmative defense, there is allocated to the defendant both 1) the burden of initial production and 2) the burden of ultimate persuasion.

The burden of production necessarily implies the risk of non-production. Unless the defendant satisfies the burden of production by having the evidence generate a genuine jury issue or *prima facie* case with respect to the defense, the defendant suffers what is, in effect, a directed verdict against him on that issue. The defense will be treated as if it is not in the case. There will be no jury instruction with respect to it and it would be improper for defense counsel to argue with respect to it.

Conversely, there is on the State no burden of production and, therefore, no risk of non-production. If the State offers no evidence with respect to the defense, as tactically it should not in such a procedural context, the State will not suffer a judgment of acquittal, at least not at the end of the State's case.[8]

---

For the less onerous defenses which impose on a defendant only the burden of production but then shift to the State the burden of ultimate persuasion, we will use as a label the "Thayer–Wigmore or 'bursting bubble' presumption."

**8.** It is conceivable that if the defendant produces a decisive and overwhelming case with respect to the defense, some counter-burden of production might then be imposed on the State, lest it suffer a judgment of acquittal at the end of the entire case. This may have been, *sub silentio*, the effect of the holding of *Warfield v. State*, where the State's evidence with respect to the defense was held to be legally insufficient. Generally speaking, however, a mere *prima facie* case by the defendant will seldom be so compelling as to impose such a risk of non-production on the State. *Gilbert v. State*, 36 Md.App. 196, 201–10, 373 A.2d 311 (1977).

On the other hand, the *sub silentio* procedural significance of *Warfield* may have been that the defense was treated not as an affirmative defense at all but as one where the defendant met his initial burden of production and where both a counter-burden of production and the burden of ultimate persuasion thereby shifted to the State. The State's evidence cannot be held to be legally insufficient except as to an issue on which the State has the burden of production.

Even when a defendant has successfully carried the burden of initial production with respect to a classic affirmative defense, the defendant still bears the burden of ultimate persuasion. The jury will be informed that the defendant has presented evidence of the affirmative defense. The jury will be further informed that the defendant has the burden of persuading them by a preponderance of the evidence [9] both 1) that the defendant **SUBJECTIVELY** believed that his intrusion was warranted and 2) that such belief was **OBJECTIVELY** reasonable. If the jury is in a state of doubt, the defendant will *ipso facto* have failed to carry his burden of persuasion and the defense must fail. With respect to a full-blown affirmative defense, the tie goes to the State.

A classic illustration of a true affirmative defense and its attendant procedures is Maryland's handling of the defense of Not Criminally Responsible. *See* Health Gen.Code Ann. § 12–109(b) (Supp.1994); *State v. Marsh,* 337 Md. 528, 539, 654 A.2d 1318 (1995); *Treece v. State,* 313 Md. 665, 684, 547 A.2d 1054 (1988); *Hoey v. State,* 311 Md. 473, 491, 536 A.2d 622 (1988); *McCloud v. State,* 77 Md.App. 528, 530–33, 551 A.2d 151, *aff'd in part, rev'd in part,* 317 Md. 360, 564 A.2d 72 (1989). Both burdens of proof are squarely on the defendant.

Supreme Court decisions that have approved as constitutional classic affirmative defenses that impose on a defendant both the burden of initial production and the burden of ultimate persuasion include *Leland v. Oregon,* 343 U.S. 790, 72

---

What is also possible, of course, is that *Warfield* did not consider these procedural incidents one way or the other. *Stare decisis* is ill served when a decision is treated as precedential authority for a proposition which, in all likelihood, was not even considered. In this case, of course, *Warfield* could be cited as *sub silentio* authority for either of two very different propositions.

**9.** Theoretically, the burden of persuasion on the defendant could be set at a higher level. In *Leland v. Oregon,* 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952), for instance, the Supreme Court affirmed the constitutionality of allocating to a defendant the burden of persuading a jury of his insanity **BEYOND A REASONABLE DOUBT**. For affirmative defenses generally, however, the preponderance-of-the-evidence standard is more routinely employed.

S.Ct. 1002, 96 L.Ed. 1302 (1952); *Rivera v. Delaware*, 429 U.S. 877, 97 S.Ct. 226, 50 L.Ed.2d 160 (1976); *Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977); and *Martin v. Ohio*, 480 U.S. 228, 107 S.Ct. 1098, 94 L.Ed.2d 267 (1987).

## B. The Lack of a Reasonable Belief As An Affirmative Element:

At the far end of the burden-of-proof spectrum, there could conceivably be imposed on the State both the burden of initial production and the burden of persuasion with respect to the mental element of the defendant's awareness that the intrusion was unwarranted. The State would thus bear the full burden of proving in a vacuum that particular element of the crime as completely as it bears the burden of establishing any of the physical elements, such as 1) the breaking, 2) the entering, or 3) the status of the place entered as the dwelling of another.

Under such a procedural regime, if the police, responding to a burglar alarm at 3 A.M., were to discover the door of a residential home broken in and were to apprehend a total stranger to the residents halfway up the stairs leading to the bedrooms, but no evidence from either party gave a clue as to what the intruder was doing there or why, the State, as a consequence of the risk of non-production, would suffer a judgment of acquittal at the end of the State's case.

Such a burden of proving a negative, however, to wit, of proving what was **NOT** in the defendant's mind, has not been imposed on the State. As a practical matter, only an infinitesimal percentage of fourth-degree burglars even assert a belief that the intrusion was warranted. To require the State to disprove this or any of a number of other possible claims, to wit, to require the State, in a vacuum, to disprove a virtually open-ended number of arcane defenses that arise only on rare occasions would be calamitous. It would have the effect of introducing all of the rare and esoteric defenses into every case. When the State proves that a defendant has been

apprehended at 3 A.M. inside the dwelling of another, it would be absurd to require the State, in the absence of any genuine issue in those regards, further to prove that the defendant was **NOT** insane, that the defendant had **NOT** been coerced, that the defendant had **NOT** been entrapped, that the defendant did **NOT** reasonably believe he was entitled to enter the premises, etc.

In the context of a prosecution for unlawful homicide, this Court fully explored, in *Gilbert v. State*, 36 Md.App. 196, 199–200, 373 A.2d 311 (1977), the policy reasons for relieving the State of the "Mission Impossible" of disproving, in a vacuum, an open-ended list of conceivable defenses:

> An example may serve to illustrate the absurdity of requiring anticipatory disproof of every consideration that might lower a homicidal *mens rea*. Posit a bank robber, armed and wearing a ski mask, apprehended at the bank door as a teller lies dead inside. It is hypothetically conceivable that the man in the ski mask is a trusted governmental agent who has, in the nick of time, saved the country from an archenemy, cleverly disguised as a bank teller. *It is conceivable, but it is not likely. Indeed, it is so unlikely that we do not require the State to disprove, as a matter of course, all such possibilities in advance as an element of its case. The catalog of things to be disproved would be endless.* The State would have to prove that the bank robber was not a lawful executioner, a policeman in pursuit of a fleeing felon, a soldier in a time of war, a threatened victim killing the teller in self-defense, the cleaner of a gun which went off by accident, a hot-blooded victim beaten by the teller, a hot-blooded combatant involved in a mutual affray with the teller, an outraged husband cuckolded by the teller, someone killing in imperfect self-defense, someone killing under imperfect duress, etc., *ad infinitum*. *There are a number of reasons why we do not require such anticipatory disproof by the State, not the least of which is the devastating impact it would have upon judicial econo-*

*my. At the most fundamental level,* however, *we do not require it, because to require it would be an absurdity.*
(Emphasis supplied).

For precisely those reasons, we hold that the burden of proof in both of its aspects, initial production and ultimate persuasion, is not on the State to prove the lack of a reasonable belief as a necessary element of the crime. Neither *Warfield v. State,* 315 Md. 474, 554 A.2d 1238 (1989), nor *Green v. State,* 119 Md.App. 547, 705 A.2d 133 (1998), remotely suggested that any such burden—particularly the burden of initial production—rested on the State. In both of those cases, the defense satisfied the burden of production by generating a genuine jury issue (a *prima facie* case) with respect to the defendant's harboring a reasonable belief that he was entitled to intrude into the premises in question. In neither case did the State suffer a judgment of acquittal at the end of the State's case as a sanction for initial non-production.

Indeed, the *Green* case went so far as to suggest that the burdens of both production and persuasion would be on the defendant as an affirmative defense:

> It follows that, in a prosecution for criminal trespass, *"it is an affirmative defense ... if 'the actor reasonably believed that the owner of the premises ... would have licensed him to enter ....'"*

119 Md.App. at 560, 705 A.2d 133 (emphasis supplied).

## C. The Lack of a Reasonable Belief As A "Bursting Bubble" Presumption:

 The third possible procedural modality is a compromise between the first two. In order not to impose on the State the costly and inefficient burden of disproving in a vacuum rarely asserted defenses, the burden of initial production with respect to any such defense is allocated to the defendant. In those cases, however, where a defendant is able to generate a genuine jury issue with respect to a defense such as the reasonable belief that an intrusion was warranted, the burden then shifts to the State to prove the challenged

mental element as surely as the State is required to prove the routine physical elements of the crime. In effect, the burden shifts to the State to disprove the defense.

The procedural device that effectuates this compromise is the Thayer–Wigmore [10] or so-called "bursting bubble" presumption. By placing the burden of initial production on the defendant with respect to relatively rare and essentially esoteric defenses, the presumption relieves the State of the inefficient and unduly onerous obligation to prove a series of negative propositions, most of which would be completely immaterial in any given case. W.R. LaFave and A.W. Scott, 1 *Substantive Criminal Law* (1986), at 72, well explains the reason for allocating to the defense this burden of raising an issue:

> Experience shows that most people who commit crimes are sane and conscious; they are not compelled to commit them; and they are not so intoxicated that they cannot entertain the states of mind which their crimes may require. Thus it makes good sense to say that if any of these unusual features are to be injected into the case, the defendant is the one to do it; it would not be sensible to make the prosecution in all cases prove the defendant's sanity, sobriety and freedom from compulsion.

(Footnote omitted).

The Thayer–Wigmore presumption is also called the "bursting bubble" presumption because once the defense has produced even a *prima facie* rebuttal of the presumption, the bubble bursts and the presumption totally disappears from the case. This is, generally speaking, the limited way in which a presumption may operate in favor of the State in a criminal case. In a civil case, by contrast, a presumption may, even

---

**10.** This use of a presumption was pioneered by and is, therefore, named for 1) James Bradley Thayer, Professor of Evidence at the Harvard Law School at the turn of the century and generally recognized as the father of the modern law of evidence, and 2) his prize student, John Henry Wigmore, later Professor of Evidence and Dean of the Northwestern University School of Law and universally recognized as the master of the law of evidence.

after a *prima facie* rebuttal, remain in a case as the equivalent of an item of evidence entitled to some weight and as the subject of a jury instruction. *See, e.g., Plummer v. Waskey,* 34 Md.App. 470, 481, 484–86, 368 A.2d 478 (1977).[11]

Lynn McLain, *Maryland Evidence* (1987), § 300.7, p. 173 n. 17, makes reference to the Maryland criminal practice of allocating to a defendant the burden of initial production with respect to a number of defenses:

> In Maryland, the defendant bears the burden of produc-tion of evidence in order to make the following defenses issues in the case: self-defense, accident, misadventure, entrapment, coercion or duress, intoxication by alcohol or drugs, and necessity, as well as theories of mitigation, including hot-blooded response to legally adequate provoca-tion.

In a criminal case, the jury will never hear of a "bursting bubble" presumption. If the defense does not meet the burden of generating a genuine jury issue by way of rebutting the presumption, the issue will never go to the jury. Theoreti-cally, the State will have proved the mental element in ques-tion, but it will have done so *sub silentio* and by operation of law. If, on the other hand, the defendant does generate a genuine issue by way of rebutting the presumption, the pre-sumption will utterly disappear from the case and the jury will never hear of it. The State will then shoulder the burden of proving the mental element, thus thrown into doubt, by the same burden of persuasion that is required to prove any other element of the crime. In *Evans v. State,* 28 Md.App. 640, 722–23, 349 A.2d 300 (1975), *aff'd, State v. Evans,* 278 Md. 197, 362 A.2d 629 (1976), we explained the operation in a criminal case of a Thayer–Wigmore presumption:

---

**11.** The lingering presumption, as opposed to the "bursting bubble" presumption, is frequently referred to as a Morgan presumption. It is named for Edmund Morgan, Professor of Evidence for many decades at the Harvard Law School, who analyzed in great depth the use of such a presumption in civil cases.

A presumption in the Thayer–Wigmore tradition simply places upon a defendant the onus of producing evidence, or of relying at his risk upon evidence produced by the State, sufficient to generate a jury issue with respect to a particular defense. Once the issue is generated by evidence, the presumption totally dissipates (the bubble bursts) and the State assumes the burden of persuasion on that issue beyond a reasonable doubt. Since the presumption has totally served its purpose once a jury issue has been created, the jury never hears of the presumption. If the issue has not been generated by evidence, the jury never receives the issue. Once the issue is generated, the jury gets the issue with the burden of persuasion thereon falling upon the State. The preliminary skirmishing on the generation *vel non* of the jury issue is of no concern to the jury itself.

The possibly critical advantage in a criminal case of placing on a defendant only the burden of initial production but not the burden of ultimate persuasion with respect to even rarely asserted defenses is that it avoids any due process problem posed by such cases as *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) and *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). Albeit not always, the rarely asserted defenses, when legitimately in issue, frequently operate to negate part of the necessary *mens rea* of the crime. When that is the case, it is unconstitutional to relieve the State of its due process burden of proving each and every element of the crime beyond a reasonable doubt. A mere Thayer–Wigmore presumption, however, does not run afoul of the Due Process Clause. As this Court very carefully explained in *Evans v. State*, 28 Md.App. at 724–25, 349 A.2d 300:

Maryland has traditionally placed upon a defendant, by the device of giving the State the benefit of a presumption to the contrary, the obligation to see that there is produced sufficient evidence to generate a jury question on such issues as intoxication, self-defense, and entrapment.

We are persuaded that nothing in *Mullaney v. Wilbur* adversely affects in any way the status of presumptions in

this limited function of requiring that there be produced sufficient evidence to generate a jury issue. The holding of *Mullaney v. Wilbur* was very careful to add a qualifying clause, at [421 U.S. 704, 95 S.Ct. 1892] 44 L.Ed.2d 522:

"We therefore hold that the Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation *when the issue is properly presented in a homicide case.*"

*Mullaney v. Wilbur* went on very explicitly, at [421 U.S. 702, 95 S.Ct. 1891] 44 L.Ed.2d 521, no. 28:

"Many States do require the defendant to show that there is 'some evidence' indicating that he acted in the heat of passion before requiring the prosecution to negate this element by proving the absence of passion beyond a reasonable doubt ... *Nothing in this opinion is intended to affect that requirement.*"

(Citations omitted; emphasis in original). *See also* Lynn McLain, *Maryland Evidence* (1987), § 300.5, pp. 150–58.

### D. The Procedural Posture in Maryland of the Reasonable Belief Defense:

■ In cases charging the fourth-degree burglary of a structure, the defense that the alleged intruder reasonably believed he was entitled to make the intrusion is relatively rare. For reasons already fully discussed, we hold that there is no burden on the State to disprove, in a vacuum, the existence of such a reasonable belief. The State enjoys the benefit of a Thayer–Wigmore presumption that an intruder does not possess such a reasonable belief. If that presumption is unrebutted, no issue in that regard will be submitted to the jury.

Because, however, it is part of the *mens rea* of the crime that the intruder be aware that the intrusion is unwarranted, *Warfield v. State*, 315 Md. 474, 500, 554 A.2d 1238 (1989), it would be unconstitutional to treat the defense as a classic affirmative defense and to impose on the defendant the burden of ultimate persuasion with respect to his reasonable

belief in that regard. Unlike the New York statutory defense of extreme emotional disturbance dealt with in *Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977), *Warfield* makes it clear that the awareness that an intrusion is unwarranted is a mental element necessary to constitute the offense of fourth-degree burglary of a structure:

> [W]e are satisfied that the legislature intended that the intrusion, to be culpable, be with an awareness that it was unwarranted—lacking authority, license, privilege, invitation, or legality.

315 Md. at 500, 554 A.2d 1238.

■ When, therefore, the defendant meets his burden of production by generating a genuine jury issue as to his reasonable belief that the intrusion was warranted, the Thayer–Wigmore presumption is dissipated—the bubble bursts—and the State assumes the burden of persuading the fact finder beyond a reasonable doubt as to the absence of such a reasonable belief. Although *Green v. State*, 119 Md.App. 547, 705 A.2d 133 (1998), did not expressly make reference to the Thayer–Wigmore presumption as the way to handle the reasonable belief defense to fourth-degree burglary, both our analysis and our ultimate decision in that case were completely compatible with the use of such a modality.

The defendant was there convicted of fourth-degree burglary by virtue of having broken and entered the home of his former girlfriend and the mother of his child. He took the stand in his own defense, however, and clearly established a *prima facie* case that he reasonably believed that he was entitled to enter the premises:

> The defense contended that appellant reasonably believed he had permission to enter McDougald's residence. It was undisputed, for example, that McDougald was the mother of appellant's young son, and McDougald conceded that appellant had previously lived with her. According to appellant, he and McDougald had an "on and off" relationship that continued for about "ten and a half years." Appellant also testified that he typically "would come up there and stay

with [McDougald] maybe a couple of days a week. . . .", and that he had even stayed with McDougald the night before the incident. Appellant also claimed he had left his work tools at McDougald's residence on a prior occasion, and had previously gained access to her residence by entering the basement window. Moreover, on the morning in question, he claimed he needed his tools for work. Further, appellant implied that McDougald refused to answer the door because she was mad at him because he went drinking with his friends the night before.

119 Md.App. at 560–61, 705 A.2d 133. The clear significance of that testimony was that the Thayer–Wigmore presumption that an intruder does not harbor a reasonable belief that his intrusion is warranted was completely dissipated. At that point, the bubble had burst. As Judge Hollander reasoned for this Court:

> In the case *sub judice*, the issue of implied permission was clearly generated by the defense's evidence.

119 Md.App. at 560, 705 A.2d 133.

Once the presumption was rebutted, the State assumed the burden of persuasion as to the special mental element—the awareness that the intrusion was unwarranted—just as surely as it bore that burden with respect to every other element of the crime. When the State has the burden of persuasion as to an element, moreover, the jury must be instructed in that regard. That was the fatal flaw in the *Green* case that led to our reversal of the conviction. As to the mental element that had to be proved, Judge Hollander expressly pointed out:

> [*Warfield*] recognized that there are situations when a person intentionally enters the property of another, based on a reasonable belief that it is permissible to do so. In that circumstance, one is not necessarily criminally culpable, notwithstanding the actual intent to enter.
>
> In order to be guilty of criminal trespass, even when one *intends* to enter the property of another, the *Warfield*

Court made clear that *one must be "aware of the fact that he is making an unwarranted intrusion."*

119 Md.App. at 560, 705 A.2d 133 (emphasis in original; second emphasis supplied).

The trial court in the *Green* case, however, simply instructed the jury pursuant to Maryland Pattern Jury Instructions–Criminal 4:06.3. That instruction lists the elements of fourth-degree burglary that the State must prove as 1) a breaking, 2) and entering, 3) of the dwelling of another, 4) by the defendant. The instruction, quite properly, makes no mention of the mental element of awareness that the intrusion is unwarranted, because generally no genuine issue has been generated with respect to such an element.

Where, as in the *Green* case, such an issue has been generated, however, the failure to instruct the jury with respect to that element unconstitutionally relieved the State of its due process burden of persuading the jury beyond a reasonable doubt with respect to every element of the crime. We pointed out, 119 Md.App. at 561, 705 A.2d 133:

> In view of the court's instructions, however, the jury was never called upon to judge the credibility of appellant or resolve the conflicting versions of events. Instead, based on the court's instructions, the jury had little choice but to convict; the court told the jury that, in order to convict appellant, the State only had to prove that there was a breaking, followed by an entry into McDougald's dwelling, and that it was appellant who committed the breaking and entering. These facts were never in dispute, however. *Yet the court refused to advise the jury that it could not convict appellant unless he entered McDougald's dwelling "with an awareness that it was unwarranted—lacking authority, license, privilege, invitation, or legality."*

(Emphasis supplied).

There was no suggestion by us that the Maryland Pattern Jury Instruction is not adequate to handle the run-of-the-mill case where the *mens rea* is presumptively satisfied. It is only in the rarer case, where that presumption is rebutted, that the

trial judge must hand-tailor an additional instruction to deal with the mental element that has been generated as a genuine issue:

> Here, although the pattern instruction was correct, it was not adequate, because it did not encompass the valid defense asserted by appellant. When the evidence generates an issue that is not covered by a pattern instruction, we must count on the court to incorporate relevant and valid legal principles gleaned from the case law.

119 Md.App. at 562, 705 A.2d 133.

This fully answers the second question that we posed at the outset of this opinion:

> With respect to such reasonable belief (or the absence thereof), to which party is allocated 1) the burden of initial production, 2) the burden of ultimate persuasion, and 3) what is the level of persuasion that must be satisfied by the party carrying that burden?

### The Procedural Proprieties in this Case

Deferring for the moment the substantive question of whether the evidence was legally sufficient to support the conviction, we will focus initially on the procedural propriety of the verdict.

Judge Smith was sitting in a fact-finding capacity in place of a jury. At the end of the entire case, the defense moved for a judgment of acquittal on the ground that the evidence was not legally sufficient to prove all of the elements of fourth-degree burglary. Judge Smith denied that motion. He had no difficulty at all with respect to the adequacy of the agreed statement of facts to establish the physical elements of the offense:

> The breaking is proved by the statement of facts beyond a reasonable doubt. The entry is proved beyond a reasonable doubt by the statement of facts. That it was somebody else's home is proved by the statement of facts beyond a reasonable doubt.

The agreed statement of facts clearly raised, moreover, a genuine fact-finding issue with respect to the appellant's reasonable belief that he was entitled to enter 924 Abbott Court at the time he and three other bailbondsmen entered it. The statement of facts established that the appellant was a bailbondsman and that he believed that James Askins, the fugitive he was charged with apprehending, was at that time staying at 924 Abbott Court.

When closely parsed, the *mens rea* of the fourth-degree burglary of a structure—to wit, the *mens rea* that may no longer be presumed when a defense is generated in that regard—consists of two parts. It is a complete defense to fourth-degree burglary if there remains a genuine possibility, not disproved beyond a reasonable doubt, of **BOTH** 1) a subjective belief by the defendant that the intrusion was warranted **AND ALSO** 2) the objective reasonableness of such a belief. The State may thus meet its burden of disproving such an exculpatory state of mind by persuading the fact finder **EITHER** that the defendant did not actually entertain such a subjective belief **OR** that such a belief, even if entertained, was objectively unreasonable.

Judge Smith correctly allocated to the State the burden of disproving beyond a reasonable doubt the appellant's exculpatory state of mind. In that regard, it is clear that the State did **NOT** prove that the appellant lacked the subjective belief that his intrusion was warranted. Indeed, Judge Smith expressly found to the contrary:

> Okay, the defendants actually believed that Mr. Atkins lived in the house and was in the house. Well, do I think they believed it? Yes, I think they believed it.
>
> . . .
>
> According to this, do I think that the defendants actually intended to commit a crime? No.
>
> . . .
>
> Let the record be clear. No, I don't think they intended to go out and commit a crime.

No I don't think they intended to—I'll give you that. You've got that. If I gave you any impression to the contrary, it was not my intention.

It was, rather, the second necessary aspect of an exculpatory state of mind that the State proved was lacking in this case. Judge Smith was not only persuaded but was persuaded to the beyond-a-reasonable-doubt level of certainty that the appellant's unquestioned subjective belief that his intrusion was warranted was, under the circumstances of this case, not objectively reasonable:

> I think they actually believed that he lived there and that he was there, but ... *I find that the belief and actions were not reasonable* under the circumstances *and that's been proved beyond a reasonable doubt.*
>
> ...
>
> [T]he motion for judgment of acquittal ... is denied and under those circumstances *I'm convinced beyond a reasonable doubt that the offense occurred and that the defendants committed the offense.*

(Emphasis supplied).

This fully answers, in the affirmative, the third question we posed at the outset of this opinion:

> Did the trial judge, sitting as a jury, apply the appropriate burden of persuasion, both as to its allocation and as to its required level of certainty, to his ultimate, conclusory fact finding on this issue of reasonable belief?

### The Legal Sufficiency of the Evidence

As we examine the statement of agreed facts to see if they are legally sufficient to support, directly or by reasonable inference, the conclusion that the appellant's belief that he was legally entitled to enter 924 Abbott Court was not objectively reasonable, our focus must first be on the pertinent law to be applied to the facts.

### A. A False Trail—The Rights of a Bondsman *Vis–A–Vis* a Defendant On Bail:

The appellant devotes a significant part of his argument to the proposition that in Maryland a bailbondsman's authority to search for and to arrest a fugitive defendant for whom bond has been posted is significantly broader than is the authority of a private citizen to apprehend a fugitive and is, indeed, in some' regards broader than the right of a police officer to search for and to arrest the fugitive. It is an interesting and frequently neglected body of law, worthy of being addressed briefly, but it ultimately does not go to the heart of the matter before us in this case.

The concept of guaranteeing the appearance of an accused at trial by having a surety post bail or collateral on his behalf is part of Anglo–American common law:

> When the defendant is regularly arrested, he must either go to prison, for safe custody; or put in special bail to the sheriff. For, the intent of the arrest being only to compel an appearance in court at the return of the writ, that purpose is equally answered, whether the sheriff detains his person, or takes sufficient security for his appearance, called *bail* (from the French word, *bailler*, to deliver) because the defendant is bailed, or delivered, to his sureties, upon their giving friendly custody instead of going to gaol. The method of putting in bail to the sheriff is by entering into a bond or obligation, with one or more sureties (not fictitious persons, as in the former case of common bail, but real, substantial, responsible bondsmen) to insure the defendant's appearance at the return of the writ; which obligation is called the *bail bond*.

3 William Blackstone, COMMENTARIES *290. *See generally* Jonathan Drimmer, *When Man Hunts Man: The Rights and Duties of Bounty Hunters in the American Criminal Justice System*, 33 Hous.L.Rev. 731, 744–47 (1996), for a more extensive discussion on the concept of bail at common law.

The landmark early American decision on the broad powers of a bondsman *vis-a-vis* his principal is *Nicolls v. Ingersoll,* 7

Johns. 145 (N.Y.1810). The Court of Appeals of New York there observed:

> The cases I have referred to are sufficient to show that the law considered the principal as a prisoner, whose gaol liberties are enlarged or circumscribed, at that will of his bail; and, according to this view of the subject, it would seem necessarily to follow, that, *as between the bail and his principal, the controlling power of the former over the latter may be exercised at all times and in all places;* and this appears to me indispensable for the safety and security of the bail.

*Id.* at 155–56 (emphasis supplied).

*See also Read v. Case,* 4 Conn. 166, 170 (1822), where the Supreme Court of Connecticut declared that "the law supposes the principal to be always in the custody of his bail; and if he is not in fact, the bail may take him, *when and where he pleases.*" (Emphasis supplied). The Supreme High Court of Judicature of Massachusetts similarly observed in *Commonwealth v. Brickett,* 8 Pick. 138, 25 Mass. 138, 140 (1829), that "the bail has custody of the principal, and *may take him at any time, and in any place.*" (Emphasis supplied).

In *Taylor v. Taintor,* 83 U.S. (16 Wall.) 366, 371–72, 21 L.Ed. 287 (1872), the Supreme Court of the United States discussed at length the broad power of the bailbondsman over his principal:

> When bail is given, the principal is regarded as delivered to the custody of his sureties. Their dominion is a continuance of the original imprisonment. Whenever they choose to do so, they may seize him and deliver him up in their discharge; and if that cannot be done at once, they may imprison him until it can be done. They may exercise their rights in person or by agent. *They may pursue him into another State; may arrest him on the Sabbath; and, if necessary, may break and enter his house for that purpose.* The seizure is not made by virtue of new process. None is needed. It is likened to the rearrest by the sheriff of an escaping prisoner. In 6 Modern it is said: "The bail have

their principal on a string, and may pull the string whenever they please, and render him in their discharge."
(Emphasis supplied).

In *Worthen v. Prescott*, 60 Vt. 68, 11 A. 690, 693 (1887), the Supreme Court of Vermont remarked that bailbondsmen "have a right to be constantly with the principal, *and to enter his dwelling, when they please to take him.*" (Emphasis supplied). In *Cartee v. State*, 162 Miss. 263, 139 So. 618, 620 (1932), the Supreme Court of Mississippi explained that bailbondsmen "may arrest their principal anywhere or authorize another to do so." *See also United States v. Keiver,* 56 F. 422, 426 (W.D.Wis.1893) ("The bail have the custody of the principal, and may take him at any time or in any place."); *Fitzpatrick v. Williams,* 46 F.2d 40, 41 (5th Cir.1931) ("[T]he right of a bail to arrest and surrender [his principal] . . . is a private one and . . . *there would seem to be no obstacle to its exercise wherever the surety finds the principal.*") (Emphasis supplied).

Of particular significance to the common law of Maryland was the observation of Lewis Hochheimer, *Law of Crimes and Criminal Procedure,* § 120, pp. 84–85 (1897) (footnotes omitted):

> **Power of Sureties.**—The sureties are the keepers of the accused. They may, without process, at any time, within or without the territory of the state having jurisdiction over the offense, reseize and deliver him up. *They* may delegate a third person to do this, for which purpose, according to some cases, the authority must be in writing, or may obtain the assistance of a sheriff, constable, or other peace officer, and *may break open doors,* no unnecessary violence being permissible.

(Emphasis supplied).

On two occasions, this Court has confirmed that broad power of the bailbondsman over the accused. In *Frasher v. State,* 8 Md.App. 439, 260 A.2d 656 (1970), we confirmed that after an accused fails to appear in court and the bond is forfeited, the bondsman may apprehend the fugitive even in

another jurisdiction and may physically haul him back into Maryland. Judge Orth there noted, 8 Md.App. at 445, 260 A.2d 656:

> In accord with the purpose of a bail bond and to make control of the principal by the surety effective, the surety has been regarded as subrogated to the rights and means possessed by the State for that purpose and to be entitled to seize his principal for the purpose of surrendering him in discharge of the surety's liability, and, to the extent necessary to accomplish this, the surety may restrain him of his liberty. Although the surety has the right to requisition official help to take the principal into custody, for the purpose of surrendering him in exoneration of his liability, the surety has also been regarded as entitled to take the principal into custody himself, and at common law no process was necessary to authorize the arrest of the principal by his bail. On the ground that the right to take the principal into custody and surrender him results from the nature of the undertaking by the bail, the rule permitting arrest without process has been applied to the right to arrest the principal in another state.

In *Shifflett v. State*, 80 Md.App. 151, 560 A.2d 587 (1989), *aff'd*, 319 Md. 275, 572 A.2d 167 (1990), the issue was whether the bailbondsman may unilaterally decide to take the accused into custody even though the accused had done nothing while on bail to justify the change in status. The defendant there claimed that a bailbondsman possessed no greater authority to arrest an individual than does a private citizen. In rejecting that defense position, Judge Robert M. Bell (now Chief Judge of the Court of Appeals), explained that a bailbondsman's authority to arrest is broader than that of a private citizen:

> Appellant's argument that the authority of a bail bondsman to effect an arrest of its principal is no greater than that of a private citizen's right to effect an arrest is simply not the law of Maryland. In point of fact, the authority of a bail bondsman in relationship to his principal is quite a bit broader.

80 Md.App. at 158, 560 A.2d 587. Judge Bell went on to quote with approval from both *Frasher v. State* and the aforementioned Supreme Court decision of *Taylor v. Taintor,* as well as from *Wharton's Criminal Procedure* § 324, pp. 201–02 (14th ed. 1986), as those authorities described the broad power of a bailbondsman at the common law. Judge Bell concluded that Maryland has not in any respect abrogated those broad common law powers of the bailbondsman:

> Looking to the purpose and intent of Maryland Rule 4–217, formerly Maryland Rule 722 and M.D.R. 722, we find no mention, or even suggestion, of an intent to change the rights of a bail bondsman to rearrest his or her principal before or after forfeiture of the bond.
>
> Since Maryland Rule 4–217 leaves intact the common law rights of a bail bondsman to arrest his or her principal, appellant's contention that the bail bondsman acted without authority in this case is without merit.

80 Md.App. at 160–61, 560 A.2d 587 (footnotes omitted).

Almost all of the discussion, both in the case law and by the academic authorities, of the broad power of a bondsman, however, concern the power, prerogatives, or authority of the bondsman over the accused himself who is on bond. It does not concern the power, prerogatives, or authority of a bailbondsman over third persons or with respect to the property of third persons. Because we are dealing, moreover, with the *mens rea* of an alleged fourth-degree burglary, we are not concerned with what the legal power, prerogatives, or authority of the bailbondsmen are in actuality but, rather, with the reasonableness of the bondsman's belief that he possessed such power, prerogatives, or authority.

Had the appellant in this case broken into the home of the fugitive, James Askins himself, it is highly likely that his belief that he was authorized to do so would not have been found to have been unreasonable. The reasonableness of his belief that he possessed such authority would have stemmed in large measure from the fact that he probably did, as a matter of law, actually possess such authority.

## B. More Pertinently–The Rights of a Bailbondsman *Vis-a-Vis* a Third Person:

In the case now before us, by contrast, the burglary allegedly perpetrated by the appellant was not of the home of the fugitive, James Askins. It was of 924 Abbott Court, the home of an innocent third person, Ms. Michelle Reed. Whereas James Askins, as a condition of purchasing a bail bond, may have contracted away the sanctity of his threshold *vis-a-vis* his bondsman, Michelle Reed had not.

The pertinent question is whether it was reasonable for the appellant to believe that he was authorized to break into 924 Abbott Court in his pursuit of James Askins. That question can take different shapes. Was it reasonable for him to believe that 924 Abbott Court was the home of James Askins? If not, was it reasonable for him to believe that 924 Abbott Court was the home of a third person but that James Askins was inside at the time of the break-in? If the latter, was it reasonable for him to believe that he was legally authorized to break into the home of a third person even if the fugitive was probably inside?

Turning initially to that third possible aspect of the question, the objective reasonableness of the appellant's belief that he was entitled to intrude into the home of a third person will in significant measure depend on whether he is, as a matter of law, actually entitled so to intrude into the home of a third person.

Although the case law on the prerogative of a bailbondsman *vis-a-vis* a third-person property owner is skimpy, the decided trend is that the bondsman lacks the broad authority over a third person that he possesses with respect to the fugitive who has violated the conditions of his bail. The pivotal difference is that the defendant who agreed to the terms of the bail bond has contracted away rights that he would otherwise possess *vis-a-vis* the bondsman, whereas a third person has not contracted away any rights.

In *State v. Tapia,* 468 N.W.2d 342 (Minn.App.1991), a pursuing bailbondsman received information that the fugitive

had been seen entering a specific apartment building. As the bondsman knocked on the door of the apartment and identified himself, he heard furniture being moved and heard an individual shout, "Don't let him in." The bondsman broke the security chain and gained access. The apartment did not belong to the fugitive. The bondsman was ultimately convicted of criminal trespass.

The Minnesota Court of Appeals began its discussion by noting that a bailbondsman derives his authority from 1) the common law, 2) a Minnesota statute, and 3) the contract between the surety and the principal. After discussing at length the landmark Supreme Court decision of *Taylor v. Taintor*, the Minnesota court noted that that case did not "specifically authorize a surety on bail bond to forcibly enter a third-party dwelling without consent to arrest a fleeing principal." 468 N.W.2d at 344. Noting that neither the common law nor the Minnesota statute expressly authorized a bondsman to enter the dwelling of a third party, the Minnesota court was unwilling to broaden further a bailbondsman's already extensive rights:

> The surety-principal contract generally authorizes the bail bondsman, or his agent, to exercise jurisdiction and control over the principal during the period for which the bond is executed. However, *this contractual authority does not include the authority to infringe upon the rights of persons who are not parties to the contract.*

468 N.W.2d at 344 (emphasis supplied).

The Court of Appeals of Indiana reached a similar result in *Mishler v. State*, 660 N.E.2d 343 (Ind.App.1996). A pursuing bailbondsman received information that a fugitive could be found in his mother's residence. Approaching that residence, the bondsman noticed the fugitive's vehicle parked outside. When the mother attempted to bar the bondsman from entering, the bondsman kicked in the front door and gained entrance. The bondsman was ultimately convicted of criminal trespass.

The Indiana Court of Appeals did not take issue with the bondsman's argument that he enjoyed a wide range of powers at common law. An earlier Indiana decision (*Turner v. Wilson*, 49 Ind. 581 (1875)), had so held. The Court of Appeals, however, drew a distinction between the broad power of the bondsman as against the principal and the lack of such broad power against a third person. It distinguished its earlier decision of *Turner v. Wilson:* "[W]e find *Turner* inapplicable here, as that case did not involve a bailbondsman's forcible entry into the dwelling of a third person." 660 N.E.2d at 345. The court held that the bondsman was not authorized to make a forcible entry into the home of a third person in order to apprehend a fugitive.

*State v. Portnoy*, 43 Wash.App. 455, 718 P.2d 805 (1986), did not deal literally with the threshold of a third person but it did confirm the principal that a bailbondsman does not enjoy the broad powers against a third person that he enjoys against a fugitive who has jumped bail. In that case, the bondsman forcibly entered the home of the fugitive himself. In an ensuing scuffle, however, the bondsman physically pushed aside the fugitive's wife and the wife's brother. In rejecting the bondsman's claim that his prerogatives were plenary, the Washington Court of Appeals observed:

> It is true that a bail bondsman has certain extraordinary powers under the common law, as a result of the contract with his client. *See Taylor v. Taintor*, 83 U.S. (16 Wall.) 366, 21 L.Ed. 287 (187[2] ). *However, Portnoy offers no authority for the proposition that the bondsmen may sweep from his path all third parties who he thinks are blocking his search for his client, without liability to the criminal law.*

718 P.2d at 811 (emphasis supplied). *See also State v. Lopez*, 105 N.M. 538, 734 P.2d 778, 783 (App.1987):

> [N]either the common law nor statutory authority of a bondsman to make a warrantless search of his principal absolves a defendant of criminal responsibility ensuing from the armed, unauthorized, and forcible entry into the residence of a third party.

And *cf. Hunt v. Steve Dement Bail Bonds, Inc.,* 914 F.Supp. 1390, 1392 (W.D.La.), *aff'd,* 96 F.3d 1443 (5th Cir.1996) (citing advisory opinion issued by Attorney General of Louisiana for proposition that bondsmen "are advised not to forcibly enter a person's residence other than their principal's without prior judicial approval."). *Contra, Livingston v. Browder,* 51 Ala. App. 366, 285 So.2d 923 (1973).

Although a law enforcement officer, of course, is subject to various constitutional restraints that probably do not inhibit the actions of a bailbonding company or of a bounty hunter hired by it, it is nonetheless illuminating to note the Supreme Court's opinion in *Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981). Even if armed with an arrest warrant for a fugitive, law enforcement officers may not, in the absence of exigent circumstances, enter the home of a third party in search of the fugitive without a search warrant. In so holding, the Supreme Court noted:

> A contrary conclusion—that the police, acting alone and in the absence of exigent circumstances, may decide when there is sufficient justification for *searching the home of a third party for the subject of an arrest warrant*—would create a significant potential for abuse. Armed solely with an arrest warrant for a single person, the police could search all the homes of that individual's friends and acquaintances. *See, e.g., Lankford v. Gelston,* 364 F.2d 197 (C.A.4 1966) (enjoining police practice under which 300 homes were searched pursuant to arrest warrants for two fugitives).

451 U.S. at 215, 101 S.Ct. 1642 (emphasis supplied). The analogy is probably not an apt one, however, for *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), prohibits the police from entering the home of even the fugitive-arrestee himself without an arrest warrant. As we have discussed at length, there is no such inhibition on a bailbondsman seeking to apprehend a bail jumper inside his own home.

The legal conclusion that a bailbondsman is generally entitled to enter, without consent by the homeowner, the home of

a third person in an effort to apprehend a fugitive is almost certainly an unreasonable legal conclusion.[12] It is unnecessary to decide, however, whether the verdict in this case would have been adequately supported by the agreed facts if the verdict had been based on the trial judge's conclusion that the appellant's belief that he was legally entitled to enter 924 Abbott Court was unreasonable because the law is otherwise. What Judge Smith actually found to have been unreasonable on the appellant's part was not so much the appellant's interpretation of the law as it was the appellant's interpretation of the facts before him.

## C. The Unreasonableness of the Appellant's Factual Conclusions:

Even if the law were what the appellant would like it to be, there would still have to be inevitable factual limitations on a

---

**12.** If the appellant's defense had been that he was mistaken as to what the law entitled him to do but that it was nonetheless a reasonable mistake, the materiality of such a defense would be highly problematic. As Judge Delaplaine observed in *Hopkins v. State*, 193 Md. 489, 498–99, 69 A.2d 456 (1949):

It is generally held that the advice of counsel, even though followed in good faith, furnishes no excuse to a person for violating the law and cannot be relied upon as a defense in a criminal action. Moreover, advice given by a public official, even a State's Attorney, that a contemplated act is not criminal will not excuse an offender if, as a matter of law, the act performed did amount to a violation of the law. *These rules are founded upon the maxim that ignorance of the law will not excuse its violation . . . .*

While ignorance of fact may sometimes be admitted as evidence of lack of criminal intent, *ignorance of the law ordinarily does not give immunity from punishment for crime,* for every man is presumed to intend the necessary and legitimate consequences of what he knowingly does. In the case at bar defendant did not claim that the State's Attorney misled him regarding any facts of the case, but only that the State's Attorney advised him as to the law based upon the facts. . . . If there was any mistake, it was a mistake of law and not of fact. . . . In other words, *a person who commits an act which the law declares to be criminal cannot be excused from punishment upon the theory that he misconstrued or misapplied the law.*

(Citations omitted; emphasis supplied).

It must be noted, however, that the crime before the Court in *Hopkins v. State* was an offense that was *malum prohibitum* and not *malum in se.*

bailbondsman's utilization of so free-wheeling a law. Let us hypothesize a town of one hundred households and a fugitive, first posting bail and then jumping bail, who had lived at No. 1 North Center Street in that town. Hypothesize further the bounty hunters who go to No. 1 North Center Street and learn reliably that the fugitive moved out one week earlier and had now taken up residence somewhere else in the town, either as the new lawful resident in one of the other ninety-nine houses or as a guest of one of those ninety-nine home-owners.

Clearly, even a free-wheeling recapture law would not permit the bailbondsmen to break into and search every other house in the town in an effort to recapture the fugitive. Before lawfully entering any of those other houses, the bailbondsmen would have to have some reasonable basis for concluding that the fugitive was inside, either as the new resident or as the guest of the existing resident. Instead of a town consisting of one hundred households, let the hypothetical be a high-rise apartment building consisting of one hundred separate units and the analysis would be precisely the same. One may not perpetrate a shakedown of an entire community.

It was in this regard that Judge Smith found, as a matter of fact, that the appellant's belief that he was entitled to enter 924 Abbott Court was not objectively reasonable. Judge Smith did not find it necessary to parse more finely the appellant's reasoning by way of deciding whether the appellant believed 1) that James Askins had himself taken up residence at 924 Abbott Court or 2) that James Askins was simply staying at the residence of some third party at that address. In either event, Judge Smith found that the appellant did not have a reasonable basis for concluding that James Askins was at that address in one capacity or the other. He concluded first that the appellant, and the other bailbondsmen who were with him, had received a tip from an unnamed person whose reliability and/or basis of knowledge were not established in any way. Judge Smith concluded in that regard:

> The Defendants actually believed that Mr. Askins lived in the house and was in the house.... Do I think they believed it? Yes, I think they believed it.
>
> *Do I think their belief was reasonable under the circumstances? No, I don't.* Just because some unknown person whose reliability is in question ... reliability cannot be even considered because we don't know who it was, we don't know whether information was given to that person at some other time.

(Emphasis supplied).

Indeed, in the case of *Hayes v. Goldstein*, 120 Ohio App.3d 116, 697 N.E.2d 224 (1997), it was just such a failure to substantiate the veracity of a tip that was critical to the court's determination that the entry into the home of a third person · by a bounty hunter on the trail of a fugitive was unreasonable:

> In the instant case, Defendant Cole produced no evidence that the fugitive owned the house he broke into; *there was no evidence to substantiate the veracity of the anonymous tip he received and therefore no way of gauging the reasonableness of his actions.*

697 N.E.2d at 225 (emphasis supplied).

Judge Smith concluded that after the bondsmen received the tip that James Askins might be at 924 Abbott Court, the reasonable thing for them to have done would have been to check further in an effort to corroborate that tip. They could have checked with the telephone company, with the gas and electric company, with the post office, with the Land Records Office, or with the tax assessment office. They could have conducted some sort of discreet surveillance on the property. They could have checked with neighbors to see if anyone new had just moved into the property. Judge Smith concluded that they could have done a number of things but that they unreasonably failed to do any of them:

> In this case what do we have, we have an unknown individual giving information at a prior address that the principal may be staying at, living at, found at 924 Abbott Court. If a police officer had brought this to me asking for a warrant

he wouldn't have gotten it. Because he didn't do anything. *He didn't do any observing, any surveillance, any verification, any confirmation, no investigation. He did absolutely nothing* ... I would have denied the request for any kind of judicial action because there would have been lack of sufficient information to cause me to believe that he was there or that his conclusion that he was there was based on reason.

(Emphasis supplied).

In the related context of what the police could have done to verify a street address in a warrant application, we observed in *Braxton v. State,* 123 Md.App. 599, 630–31, 720 A.2d 27 (1998):

[T]he quantum of facts needed to show the connection between the suspect and the purported place of occupancy is hardly daunting. Typically, an affiant includes an averment trying the suspect to the targeted location on the basis of surveillance, a check of utility records, verification with a landlord, an address from the phone book, or the like.

The one case on which the appellant relies more than on any other is that of *Livingston v. Browder,* 51 Ala.App. 366, 285 So.2d 923 (1973). Although that case does, to be sure, hold generally that a bailbondsman is authorized to enter the home of a third person, its facts contrast sharply with those in the case now before us. Whereas in our case there was no corroboration of the tip that James Askins was in 924 Abbott Court, in *Livingston* the bailbondsmen had made first-hand observations as indisputable confirmation before they entered:

The evidence tended to show that *the appellant saw and recognized Gilmer's car outside appellee's home. He also saw Gilmer sitting inside when he walked up to the porch to knock on the door.* After he knocked on the door, *he saw Gilmer leave the room,* and appellee came to the door and opened it. *While the door was open, he saw Gilmer going down the back hallway* and stepped through the door and apprehended him. These actions would present a question for the jury as to the reasonableness of the actions as there

was no violence whatsoever. Gilmer peacefully submitted to the arrest.

285 So.2d at 927 (emphasis supplied).

The *Livingston* case contrasted with the case now before us in yet another significant regard. The *Livingston* court stressed that the homeowner "came to the door and opened it," that the bailbondsmen "stepped through the door," and apprehended the fugitive who "peacefully submitted to the arrest." The court concluded that those "actions would present a question for the jury as to the reasonableness of the actions as *there was no violence whatsoever.*" 285 So.2d at 927 (emphasis supplied). In the case before us, by contrast, the appellant and his confederates broke down the door of 924 Abbott Court with an axe.

Such a potential for unreasonable violence was of clear concern to Judge Smith:

> Were it otherwise, *a bail bondsman can receive word from any Joe Blow anytime anywhere* that Jim Jones was located in my house *and break down my door.* That [is not] the law, not just my house, anybody else's house.... There must be some confirmation, some information.

(Emphasis supplied).

The *Livingston* case, moreover, points to another respect in which the appellant's intrusion in this case may have been unreasonable and, more particularly, may have been known by him to have been unreasonable. When the appellant and his confederates were confronted by the innocent homeowner, they affirmatively misrepresented themselves as members of the Fugitive Squad of the Baltimore City Police Department. They never made known their status as bailbondsmen looking for a fugitive. With respect to such misrepresentation, the *Livingston* court observed:

> We particularly note that there is a factual question involved in the case whether appellant-Livingston misrepresented himself or his status. If appellant misrepresented

his authority, or did not have authority, he might be found guilty of a trespass.

285 So.2d at 927.

The appellant and his fellow bailbondsmen also offered Ms. Reed approximately $75, ostensibly to recompense her for day care services for her children, but inferentially to pay for the broken door.[13] She refused the offer. Both the offer of some sort of payment and the misrepresentation as to who they were are indications that the appellant and his confederates may not even have believed subjectively that their intrusion was reasonable.

With respect to the critical question of whether the State carried its burden of persuading the fact-finding judge that the appellant's belief that he was entitled to break down the door of 924 Abbott Court was not objectively reasonable, Judge Smith's conclusion was clear:

I think they actually believed that he lived there and that he was there, but ... *I find that the belief and actions were not reasonable under the circumstances* and that's been proved beyond a reasonable doubt.

(Emphasis supplied).

There is support for such a conclusion in the undisputed circumstances set out in the agreed statement of facts. Neither that inferential and conclusory finding of fact, therefore, nor the verdict that inevitably followed from it is clearly erroneous. We are by no means suggesting that precisely the same predicate circumstances could not have given rise to the diametrically opposite inferential conclusion that the appellant's belief was reasonable. From the same predicate circumstances, the factfinding trial judge could have drawn either inference without being clearly erroneous. *Danz v. Schafer*, 47 Md.App. 51, 61–65, 422 A.2d 1 (1980).

---

13. In the agreed statement of facts, Ms. Reed stated that the offer was to pay her for her day-care expenses, but that agreed statement also set out that Mr. Parsons, one of the bailbondsmen, "stated that Mr. Weiner offered Ms. Reed money to pay for the kids' day-care and for damage to the door."

This fully answers the fourth and final question that we posed at the outset of this opinion:

Were the uncontested facts, recited in the agreed statement, legally sufficient to support the verdict?

*JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.*